Bert Leroy HUNTER, Petitioner,

v.

Harold R. SWENSON, Warden, Missouri
State Penitentiary, Respondent.

No. 18635-2.

United States District Court,
W. D. Missouri, W. D.

March 8, 1974.

Ronald Sokol and Thomas M. Larson,
Asst. Fed. Public Defenders, Kansas
City, Mo., for petitioner.

John Danforth, Atty. Gen. of Mo., Jefferson City, Mo., for respondent.

## MEMORANDUM OF DECISION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

COLLINSON, District Judge.

This is a petition for a writ of habeas corpus by Bert Leroy Hunter, a Missouri state prisoner. 28 U.S.C. §§ 2241–2254 (1970). Hunter was convicted of first degree murder by a jury in the Circuit Court of Andrew County, Missouri, on May 1, 1969, and was sentenced to life imprisonment on May 22, 1969. Hunter's conviction was affirmed on appeal to the Missouri Supreme Court. State v. Hunter, 456 S.W.2d 314 (Mo. 1970).

Hunter's habeas petition was filed in this Court on August 21, 1970. He advanced two grounds to support his contention that he is being held unlawfully in state custody:

(a) Petitioner's constitutional rights were violated and his conviction was obtained by the admission into evidence against him of a confession which was not voluntary in that it was coerced by the police by repeated and protracted custodial interrogation without counsel and by repeated false promises by police that petitioner would receive help and a reduced charge for his cooperation.

(b) Petitioner's constitutional rights under the Fifth and Fourteenth Amendments were violated and his conviction was obtained by the admission into evidence against him of a confession obtained in the absence of a knowing and intelligent waiver of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694.

On September 23, 1970, the Court denied the petition without an evidentiary hearing. On appeal, the United States Court of Appeals for the Eighth Circuit reversed the Court's order and directed that an evidentiary hearing be held. Hunter v. Swenson, 442 F.2d 625 (8th Cir.), cert. denied, 404 U.S. 863, 92 S.Ct. 76, 30 L.Ed.2d 107 (1971). Pursuant to that direction and after fairly extensive discovery, an evidentiary hearing was held. In addition to the testimony of several witnesses, the Court received various exhibits in evidence, including two police reports and the transcripts of all the state court proceedings. At the Court's request, respondent provided as a Court Exhibit a copy of Hunter's August 5, 1968, statement, the subject of this action.

## I. FINDINGS OF FACT [1]

In the final analysis, there are very few disputed facts. Nevertheless, the Court believes that an extensive and detailed statement of the facts is necessary for proper disposition of this action.

1. For the sake of clarity, the Court will describe and label the exhibits to which reference will be made in our findings of fact:

Petitioner's Exhibit 1 is entitled "Missouri State Highway Patrol Supplementary Investigation Report Number 16" and is dated July 16, 1968. This document will be referred to as "Report 16." It is signed by Sgt. J. E. Shirley and Trooper (now Corporal) J. R. Noyes.

Petitioner's Exhibit 3 is entitled "Missouri State Highway Patrol Supplementary Investigation Report Number 17" and is dated July 17, 1968. This document will be referred to as "Report 17." It is signed by Sgt. J. E. Shirley.

Respondent offered two unnumbered exhibits. The first is the transcript of the March 11, 1969, state court hearing before Circuit Judge John M. Yeaman on Hunter's motion to suppress his August 5, 1968, statement. This hearing will be denominated the "Motion Hearing." References to the transcript will be "M.Tr. ——." The second exhibit is the record of the state circuit court proceedings filed on Hunter's appeal to the Missouri Supreme Court. The record contains the transcript of Hunter's April 30–May 1, 1969, trial before Circuit Judge Fred E. Schoenlaub. References to the transcript will be "T.Tr. ——." The pagination of the transcript itself will be used; the pagination of the record containing the transcript will not be followed. The trial transcript also contains an in-trial hearing to determine the voluntariness of Hunter's statement (T.Tr. 28–97). This hearing will be denominated the "Trial Hearing." The trial transcript

For that reason, the Court will make extensive findings of fact.

John Monford Lyle was robbed and shot to death at his tavern in Amazonia, Andrew County, Missouri, in the first hour of June 16, 1968. Lyle's body was discovered shortly after 7:00 a. m. The investigation was undertaken by the Andrew County Sheriff and the Missouri Highway Patrol. Within a few hours the investigation began to focus on Hunter and Carl Paxton. On June 18, Hunter and Paxton were stopped by a city policeman while driving in Atchison, Kansas, and were taken to the city police station. Hunter was interviewed at the police station regarding the Lyle murder by Sergeant James Rhoades of the Missouri Highway Patrol and Andrew County Sheriff Paul Howard. This interview occurred at approximately 1:00 a. m. Hunter voluntarily agreed to talk with Sgt. Rhoades. At the conclusion of the interview, Hunter agreed to appear at the Highway Patrol Headquarters in St. Joseph, Missouri, at 10:00 a. m. that day and to submit at that time to a polygraph examination. The interview at the Atchison police station lasted approximately one hour. Hunter was allowed to leave at the conclusion of the interview.

As agreed, Hunter went to the St. Joseph Highway Patrol Headquarters and submitted to a polygraph examination administered by Sgt. J. E. Shirley. Again on June 21, 1968, and on several other occasions prior to July 13, 1968, Hunter went to the Highway Patrol Headquarters to be interviewed by various law enforcement officers. Hunter's visits to the Highway Patrol Headquarters were entirely voluntary.[2]

On July 13, 1968, Hunter was arrested in Atchison, Kansas, for possession of a firearm after a felony conviction, a violation of Kan.Stat.Ann. § 21–2611 (1964). Hunter, Paxton, and Joseph Walker allegedly were target practicing in the country when Walker was wounded by a stray bullet. They took Walker to a hospital in Atchison. Two Atchison policemen came to the hospital and escorted Hunter and Paxton to the police station to talk with the Chief of Police about the shooting. An incident occurred at the police station which demonstrates Hunter's knowledge and facility with criminal law, no doubt a product of his long exposure to it. Hunter testified to the following at the Trial Hearing:[3]

> Well, when we entered the Atchison, Kansas Police Station parking lot, the policeman in my car with me told me to drive my car into the garage. Well, I drove my car in the garage and the Chief was standing inside the garage, and as I got out of the car he asked me if he could search my car, and I told him no, I would not submit to no search of my car unless he had a search warrant. He said that he would proceed to get a search warrant, and at that time I asked him what grounds he had as evidence supporting an affidavit to get a search warrant (T.Tr. 64).

Hunter was unable to post bail and was confined in the Atchison jail on the firearm possession charge. Paxton was released by the Atchison police, but later a

also contains an excerpt from Hunter's October 11, 1968, preliminary hearing (T.Tr. 88–93).

Hunter's August 5, 1968, statement (nine pages), introduced as a Court Exhibit, will be referred to as the "statement" and references to it will be by its pagination.

2. During the Motion Hearing (see n. 1 *supra*), Hunter testified as follows:
Q. Do you recall where these conversations took place?
A. The State Patrol Building.

Q. In St. Joseph?
A. In St. Joseph.
Q. Did you go there voluntarily at their request?
A. Yes.
Q. On how many occasions did you go to the State Patrol Building?
A. Several. I imagine three or four at least. I'm not sure of the exact amount (M.Tr. 5).

3. See n. 1 *supra*.

warrant was issued for his arrest. A copy of the warrant was sent to the police in St. Joseph, Missouri, and Paxton was arrested. He was held in the St. Joseph jail pending extradition to Kansas. While so detained, he was interviewed by Missouri authorities regarding the Lyle murder.

On July 15, 1968, Sgt. J. E. Shirley and Trooper John Noyes of the Missouri Highway Patrol interviewed Hunter at the Atchison jail. Sgt. Shirley first advised Hunter of his constitutional rights. He told Hunter that Carl Paxton (later also convicted of the murder of Lyle) had made a statement accusing Hunter of killing Lyle.[4] During this interview Hunter stated that he was not directly involved in the murder but knew a great deal about it; that he and Pax-

ton had planned for some time to rob Lyle but had not set a date; that during the early minutes of June 16, Hunter, Paxton, and another unnamed person were driving near Amazonia; that Paxton had a .22 caliber handgun with him; that Hunter exited the automobile three blocks south of Lyle's tavern and hid among the trees while Paxton and the other person drove to the tavern; that a short time later Paxton returned, "driving like crazy," and picked up Hunter; and that they later drove to the home of Teresa Peak in Atchison, Kansas, arriving about 2:30 a. m. This interview lasted approximately 2 hours and 30 minutes.[5]

On July 16, 1968, Sgt. Shirley returned to the Atchison jail and again interviewed Hunter. Sgt. Shirley was ac-

4. At the hearing before this Court, Sgt. Shirley did not recall saying anything about Carl Paxton during the July 15 interview in the Atchison jail. Sgt. Shirley's Report 16 (see n. 1 *supra*), however, noted the following: "Hunter was first informed that Carl Paxton had been telling all he knew about the murder of John Monford Lyle and had stated that Bert Hunter was the man who actually shot Lyle to death." At the Motion Hearing, Hunter testified as follows regarding what Sgt. Shirley said during the July 15 interview:

Well, Sgt. Shirley told me that Carl Paxton was arrested in St. Joseph on a fugitive warrant concerning the illegal possession of the pistol in Atchison, Kansas, and that Carl Paxton had made a statement to him and Sgt. Jim Rhoades concerning me and the case at present. And he said that Carl Paxton had signed a statement implicating me as the one that had shot John Monford Lyle . . . ." (M.Tr. 6–7).

5. Hunter's statements on July 15 are evidenced by Sgt. Shirley and Trooper Noyes' Report 16 (see n. 1 *supra*). At Hunter's trial, Corporal Noyes testified briefly to the contents of the July 15 interview:

Q. Corporal Noyes, I want to direct your attention specifically to the 15th day of July, 1968, and ask you to tell the jury whether or not you talked to the defendant, Bert Leroy Hunter, and if so, where and who was there?
A. I did. It was at the Atchison County Jail in Atchison, Kansas, and Sergeant Shirley was there with me.

Q. What was the occasion of your talking with Mr. Hunter?
A. I went to talk with him about the murder of Mr. Lyle.
Q. Corporal Noyes, do you recall whether Mr. Hunter was warned of his constitutional rights that everybody talks about that everybody has when they are accused of violating a law there on that day?
A. Yes, sir; he was.
Q. Do you recall how he was informed of these rights?
A. He was informed by Sergeant Shirley verbally.
Q. Did he make any statement to you all there about the Lyle incident and, if so, what did he say?
A. He admitted knowledge of it and he stated that there were three of them went to Amazonia in the car, and he got out of the car south of Amazonia and the other two went to the tavern.
Q. Did he name either of the other two?
A. He named Carl Paxton and said the other person he would not name.
Q. Did he make any statements to you as to what happened up at Amazonia that evening when he was talking to you there at that time?
A. He stated that these two, Paxton and the other man, went on to Amazonia and they came back, and he stated they were driving, I believe he said "crazy." They stopped and picked him up and they went on back to St. Joseph.
Q. Did he ever tell you the name of the other individual?
A. No, sir; he never did.

companied by Corporal (Trooper) Noyes and Lois Sowards, a stenographer. Mrs. Sowards was present in the event Hunter agreed to make a written statement. Sgt. Shirley believed this to be possible. Before the interview began, Sgt. Shirley advised Hunter of his constitutional rights and Hunter acknowledged that he understood them.

The substance of the ensuing interview is well summarized in Report 17: [6]

At 2:20 p. m., Bert Hunter was re-interviewed at the Atchison County Jail. Prior to any questions asked, Sergeant Shirley re-advised Hunter of his constitutional rights and asked if he was fully aware of his rights. Hunter answered in the affirmative. The main gist of the 2 hour interview can be condensed to these few facts. Hunter stated that due to the fact that he has had four previous felony convictions, he was now deeply worried about the illegal possession of weapon case pending against him in the state of Kansas. He wanted to make this deal: If Andrew County Prosecuting Attorney Al Lance would negotiate the dropping of charges pending against him in Kansas, he in turn would guarantee to take officers to the point where the murder weapon had been thrown into the Missouri river, would guarantee the finding of the weapon, would give a full and complete confession regarding the murder, naming the killer and name the person with blood on their hands. He indicated he would plead guilty to a charge of accessory before and after the fact. Hunter stated he was not the least bit worried about being directly involved in the murder. He still contends there was a third party involved but adamantly refuses to ever reveal his name. Sergeant Shirley advised Hunter that he was of the opin-

ion that Mr. Lance would try to work with him, but not on this basis, i. e. that Hunter was asking for too much leniency and that since he refuses to name the third person, if there be such a person, he was not showing full cooperation.

Mrs. Soward's testimony at the Trial Hearing clearly and convincingly evidences what was said during the July 16 interview:

Q. At this time were there any conversations about any reduction of charges or extradition or anything of that nature?

A. Yes. Bert Leroy Hunter was asking Sergeant Shirley if he could talk to Mr. Lance. That was mostly the conversation in July when we were at the Atchison County Jail, about what charges would be filed on him, and he wanted Mr. Lance to come over so he could talk to him, because Sergeant Shirley explained to him it was Alden Lance's place to file charges. It wasn't up to the Patrol what charges would be filed, and he did want Sergeant Shirley to relay a message to Mr. Lance. He wanted to see him (T.Tr. 37).

. . . . . .

Q. What did the Sergeant tell him about talking to Mr. Lance?

A. He would relay the message to Mr. Lance that Hunter wanted to see him (T.Tr. 38).

. . . . .

THE COURT: Mrs. Sowards, if I may interrupt here. You stated in answer to one of Mr. Newhart's questions that on July 16 the defendant stated in your presence that he did not want to give a statement.

THE WITNESS: On July 16.

Q. This was on July 15, is that correct?
A. Yes, sir.
Q. Did you hear anybody make any promises to Mr. Hunter on that date about any reduced charges being filed if he would make a statement or talk to you?

A. No, sir. There was none in my presence (T.Tr. 153–55).

6. See n. 1 *supra*.

THE COURT: Do you have the statement in your notes?

THE WITNESS: I have what he stated. The conversation went back and forth.

THE COURT: Would you repeat that conversation, the questions and answers during that time?

THE WITNESS: He stated that, "If I give you a statement I will appear in no court to testify." He said, "Get in touch with Mr. Lance and see if he can get these charges dropped. I can beat these, but it will take me a while and cost me a lot of money." The Sergeant's answer to getting the charges dropped was, "I don't know." Do you want me to go on?

THE COURT: Yes.

THE WITNESS: Hunter stated, "I think that really they don't have anything here. The only thing that bothers me is Kansas law. I am not worried about any charge in St. Joseph, unless I give a statement and they catch me as an accessory. Other than that I would have no charges I am afraid of. Promise me immunity and I can tell you who had the pistol when I seen them and who had blood on his hands and who said 'Gun it.'" These are quotes. "I wasn't inside the place besides on Friday afternoon or one afternoon. We were there that evening. I have said nothing that would stand up in court. I haven't said anything. Lots of people are killers. You could be a killer. Anybody is capable of murder. I don't think that murder up there was planned. Nobody can put me inside that place." He said, "Did you find any fingerprints at that place? There should be some in that place," and he quit. "I think if I gave a statement, if you confronted Paxton, he would break down completely. That is my own personal belief. Offer me immunity now in writing and I will tell you. I will give you a statement. I can tell you where the gun is. I can take you to the place. The gun wouldn't help me out. If you want anything at all, it would have my prints. I don't want to tell you where the gun is till you talk to Lance and see if----." Sergeant Shirley interrupted and said, "If you give us a complete, honest statement, if that is possible from you, would this put you in direct involvement in the murder?" Answer from Hunter, "No." Question: "Would it make you an accessory before or after the fact?" Answer: "Possibly make me an accessory after. I have four felony convictions in Kansas. Three can get you twenty [years]. This is double up-catch up." That was the major portion of the conversation on July 16 (T.Tr. 42–44).

Corporal Noyes' testimony at Hunter's trial reflects that Hunter also related the same substantive story on July 16 that he told Sgt Shirley and Noyes on July 15:

Q. Did you ever talk to Mr. Hunter again about this case?

A. On the 16th of July.

.   .   .   .   .   .

Q. Did he make any statement at that time?

A. Yes, he made verbal statements at that time.

Q. Was he warned of his rights on that date by anyone and, if so, whom?

A. He was warned by Sergeant Shirley verbally before the interview began.

.   .   .   .   .   .

Q. What did he say there in the conversation about the Lyle incident?

A. Well, he wanted to make a deal with us to have the Kansas charge dropped so he could come into Missouri for a lesser charge, and we advised him we were not

in a position to negotiate with him for any such thing, and he wanted the Prosecuting Attorney of Andrew County to see about getting the Kansas charges dropped so he could come back into Missouri, and he stated that if that would happen, he would take the officers to the point where the murder weapon was thrown into the Missouri River and that he would guarantee the finding of the weapon and would give a full and complete confession regarding the murder and naming the killer.

Q. Would you tell the jury whether or not on that date he made any statement about whether or not he was at Amazonia on the night in question?

A. He was not at the Lyle tavern. He stated at this time he was not at the Lyle tavern and that he got out south of Amazonia.

Q. This was the same story he had told on the 15th?

A. Yes. He stated there were three persons in the car and he got out south of Amazonia and that Paxton and the third person went on to Amazonia, and he still refused to name the third person (T.Tr. 155–57).

Hunter initiated the July 16 discussion of a possible deal, namely, a statement regarding the Lyle murder in exchange for dismissal of the pending Kansas charge. Hunter's motivation for doing so is apparent. He was seriously concerned about the pending Kansas charge. His fear of Kansas law was well founded. If Hunter had been convicted of the firearm possession charge in Kansas, since it would have been his fifth felony conviction, his sentence could not have been less than fifteen years and could have been as much as life imprisonment. Kan.Stat.Ann. § 21–107a (1964). On the other hand, Hunter believed that if he gave a truth-ful statement, his criminal exposure in Missouri for the Lyle murder was limited to a charge of accessory after the fact. Conviction on such a charge "shall be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not exceeding one year nor less than six months, or by fine not less than four hundred dollars, . . . and imprisonment in a county jail not less than three months." Mo.Rev.Stat. § 556.180 (1969), V.A.M.S. Recalling that Missouri does not increase the penalty for habitual criminals, Mo.Rev.Stat. § 556.280 (1969), V.A.M.S., one can readily appreciate why Hunter was willing and anxious to expose himself to imprisonment in Missouri for three months to five years in order to avoid the possibility of imprisonment in Kansas for fifteen years to life.

Although Sgt. Shirley and Hunter discussed in a general fashion the nature of the charges that could be filed, Sgt. Shirley gave Hunter no assurances during the July 16 interview regarding the charges that would be filed. Nor did Sgt. Shirley promise that the Kansas charge would be dismissed in exchange for a truthful statement. In that discussion, Hunter himself suggested that a charge of stealing over $50 should be considered by the prosecutor. Sgt. Shirley did inform Hunter that the charges could be that low depending on the extent of Hunter's involvement in the robbery and murder. Sgt. Shirley also unequivocally informed Hunter that he was not in a position to bargain with Hunter but that he would relay all this information to Prosecuting Attorney Lance. At the conclusion of the interview, Sgt. Shirley told Hunter to contact him if Hunter wanted to discuss the case further. This interview lasted approximately two hours.

Some time after the July 16 interview, Teresa Peak visited Hunter in the Atchison jail. She told Hunter that Paxton had made a statement implicating Hunter in the murder of Lyle. Hunter sent a message to Sgt. Shirley through

Teresa Peak to the effect that Hunter was now willing to cooperate and wanted to talk with Sgt. Shirley. On August 5, 1968, Sgt. Shirley, Sgt. Rhoades, and Lois Sowards went to the Atchison jail in response to Hunter's message. Before interviewing Hunter, Sgt. Shirley advised Hunter of his constitutional rights by reading them from a card he carried in his billfold.[7] Sgt. Rhoades handed Hunter a form which also recited Hunter's constitutional rights, including his rights to remain silent and to have the assistance of counsel. This form contained a statement waiving those constitutional rights. Sgt. Rhoades asked Hunter to read the form. Hunter did so. Sgt. Rhoades then read the form to Hunter and asked him if he understood each and every right recited on the form. Hunter replied that he did and signed the waiver form. Hunter's signature was formally witnessed by Sgt. Shirley and Sgt. Rhoades who also signed the form.[8] At this time Hunter was 21 years and 5 months of age and had completed 11 grades of school.

Before Hunter made any incriminating statements, Sgt. Shirley related a message to Hunter from Prosecuting Attorney Lance. The message was that it was possible Lance would consider charging Hunter with an offense less than murder if Hunter would cooperate and give a truthful statement and if Hunter was not directly involved in the murder. The nature and tenor of this message is evidenced by Sgt. Shirley's testimony on three different occasions. At the Motion Hearing, Sgt. Shirley testified as follows:

Q. After talking to Mr. Lance didn't you go back down and talk to Mr. Hunter and tell him what Mr. Lance had told you to say?

A. Yes. I just repeated what he told me to say.

Q. Didn't Mr. Lance tell you to say that if he would cooperate it's possible, very possible that they would consider a lesser charge?

A. That's right.

Q. Then you told Mr. Hunter that?

A. I said "it's possible."

Q. You said it's possible, it's possible that Mr. Lance would consider a lesser charge if he would cooperate? You relayed that message to Mr. Hunter?

A. I did.

Q. Those were words spoken by Mr. Lance that you relayed to Mr. Hunter in the Atchison County Jail?

A. Right.

Q. Prior to the time of the statement?

A. Yes, sir (M.Tr. 27–28).

At the hearing before this Court, Hunter questioned Sgt. Shirley about this testimony. Sgt. Shirley confirmed that this testimony accurately reflected what was said, but he observed that it was not complete because it did not reflect the qualification that Hunter not be directly involved in the killing. Sgt. Shirley also testified about this matter at Hunter's October 11, 1968, preliminary hearing on the murder charge. The relevant portion of his testimony was introduced at the Trial Hearing:

Q. In turn, did Mr. Lance relay a message back to Mr. Hunter?

A. He advised upon Mr. Hunter's show of good faith he would be willing to listen to him. He didn't relate that he would actually do anything, but he did tell him—tell me to tell him that he would be willing to not bargain but—but to—

THE COURT: Consider?

A. (The witness) Consider a lesser charge. Thank you, Judge.

Q. (By Mr. Randolph) Did you relay this message back to Mr. Hunter?

A. I did.

7. T.Tr. 53–54, 161–62.

8. T.Tr. 105–06, 167–68.

Q. And that was the gist of which was if he co-operated Mr. Lance would consider a lesser charge? That was the Court's words that you said, "Thank you, consider"?

A. Yes, consider, that's right, yes, Sir (T.Tr. 92).

Hunter never believed that this message from Mr. Lance or any other statement by any other person constituted a promise to file a charge less than murder in exchange for a statement. This is evidenced by Hunter's testimony at the Trial Hearing:

THE COURT: This offering of a deal you talk about was made, you say, when Sergeant Shirley was down there on August 5, is that correct?

THE WITNESS [Hunter]: Not on August 5. It was the time before [July 16] that he was talking about a reduction of charges and Mr. Lance wanted me to cooperate, and if I would cooperate, he would help me. On August 5 I think the only thing he said about such cooperation was that Mr. Lance said that it was possible and that he gave me the impression that Mr. Lance was very willing to cooperate.

THE COURT: On August 5?

THE WITNESS: Yes.

THE COURT: That is when you had the conversation about stealing over $50.00 and a year in jail?

THE WITNESS: There was some conversation at that time concerning over $50.00 stealing charge and a year in jail, but the main part of the conversation occurred the time before that [July 16] (T. Tr. 76).

. . . . . .

Q. All he [Sgt. Shirley] ever said was it is possible that Mr. Lance may do something, is that correct?

A. [By Hunter] I never said it was a definite thing. I said I was under the impression a reduced charge would be filed (T.Tr. 87).

After Sgt. Shirley related the message to Hunter from Mr. Lance, Hunter made an oral statement which was taken in shorthand by Mrs. Sowards. She typed the statement. Hunter read it, made corrections, and signed it. The following is a brief narrative of pertinent portions of Hunter's statement:

On the night of June 15, 1968, Hunter and Paxton drove to Amazonia, Missouri. They drove by Mr. Lyle's tavern several times. They stopped and Hunter walked up to the door of the tavern and looked in. Mr. Lyle was sitting at his desk in the tavern counting money. Hunter returned to the car and they drove off. They later returned to the tavern and parked in front of the building. Both Hunter and Paxton went to the door of the tavern. One of them knocked on the door several times. When Mr. Lyle started walking toward the door, Hunter walked around the corner of the building. Paxton asked Mr. Lyle for some beer when he came to the door. Mr. Lyle got some beer and returned to the door. Paxton then went inside. Hunter started walking toward a telephone booth on the street. When he walked back to the tavern, Hunter heard scuffling inside followed by two shots. He ran to the car and Paxton came out of the tavern with a gun in one hand and a cigar box containing money and checks in the other hand. They both got in the car and drove away. Paxton told Hunter that he shot Mr. Lyle twice in the head. Later that night they threw the gun in a river, burned the checks, divided the money, and drove to Atchison, Kansas. The shooting occurred about 12:20 a. m. on June 16, 1968.

Hunter's statement also contains the following questions and answers:

Q. Would you be willing to testify in a court of law, if needed, in regard to the facts in this statement?

A. I don't know. *Depends on what kind of charge is going to be placed against me.*

Q. Is everything you have told us been the truth?

A. Yes.

Q. Have any threats or promises been made to you by any member of the Missouri State Highway Patrol or any other agency working on this case to induce you to give this statement?

A. *The sole reason I am making the statement is to protect myself from something I didn't do.*

Q. After Mrs. Sowards types this statement, are you willing to read the statement, initial any mistakes, and make corrections and sign the statement?

A. I've gone this far. There ain't no use stopping (Pp. 8–9; emphasis added).

It is clear from this that at the time Hunter made the statement, he did not believe that a promise had been made to file a specific charge against him for his statement. It is also evident that the sole motivation for making the statement was to refute the statement made by Carl Paxton naming Hunter as the killer.

While Mrs. Sowards was typing Hunter's statement, Sgt. Shirley asked Hunter "what he thought would happen when this statement was signed and brought back [to Mr. Lance], in the event that the Andrew County Prosecuting Attorney saw fit to file a charge of first-degree murder."[9] Hunter replied that he would claim that Sgt. Shirley had not informed him of his rights and that he had not understood his rights. Hunter also claimed that he would produce two witnesses, one of whom was a minister, who would testify that Hunter had stayed at the minister's house the night of the murder. Hunter also said that he would have himself declared mentally incompetent.[10] This exchange is very important for two reasons. First, it demonstrates that Mr. Lance's August 5 message to Hunter did not foreclose the possibility of a murder charge being filed. Secondly, it demonstrates that Hunter was fully aware *before* he signed his statement that a murder charge was not foreclosed by the mere fact that he made a statement and that the contents of the statement would influence Mr. Lance's decision on what charge to file against Hunter. The August 5 interview lasted four hours.

On August 26, 1968, Sgt. Shirley and Mrs. Sowards returned to the Atchison jail to talk with Hunter in an effort "to tie up some loose ends of the case."[11] Hunter made no additional statements regarding the murder at this interview. Hunter, however, again initiated a discussion regarding a deal, asking Sgt. Shirley to contact Prosecuting Attorney Lance "to make some kind of deal."[12] Sgt. Shirley again told Hunter that he did not have authority to make any deal, but he would relay Hunter's request to the prosecutor.[13]

On August 31, 1968, Prosecuting Attorney Lance and Sgt. Shirley delivered a warrant for the arrest of Hunter to the Atchison County Sheriff. The warrant charged Hunter with the first degree murder of John Monford Lyle. Mr. Lance and Sgt. Shirley also talked with Hunter. Hunter's and Sgt. Shirley's recollections of this conversation are largely the same. At the Motion Hearing, Hunter testified as follows:

Q. What was said at that time?

A. I asked Mr. Lance what he was planning to charge me with, and he had a brief case with him with some papers, and he handed me a warrant for me of first degree murder [probably a copy of the warrant delivered to the Sheriff], and I asked him why he was charging me with this, or did he actually think that I was the one

9. T.Tr. 113.

10. T.Tr. 113.

11. T.Tr. 108.

12. T.Tr. 109.

13. T.Tr. 109.

that did the actual shooting, and that he didn't think that the statement I gave him was true, was a true statement. I asked him what about—that I had the understanding between me and Mr. Shirley that some help and consideration would be given me, and that the charge could go as low as stealing over $50.00, and he at that time told me, "well, Mr. Hunter, you don't have anything to deal with", and they proceeded to leave at that time (M. Tr. 13–14).

Sgt. Shirley testified to the following before the jury at Hunter's trial:

Q. Was he informed at that time what charge had been filed against him?

A. He was informed that the Sheriff of Atchison County, Kansas had in his possession a warrant for first-degree murder.

Q. What conversation transpired in your presence there?

A. He stated that he thought that was too severe. He thought that at one time he might be charged with stealing over $50.00. He stated that he under no circumstances wanted to be returned to the Missouri State Penitentiary. He stated that he would testify as a state's witness against Carl Paxton if the Andrew County Prosecuting Attorney would cause charges to be dropped against him that were pending at that time in the State of Kansas. He used the term "hurry up and catch up [a reference to the Kansas habitual criminal statute]."

. . . . . .

Q. What conversation was had between Mr. Hunter and the Prosecutor about any kind of deal, if you recall?

A. I recall the very words. The Prosecutor said, "It is just like I have a brand new car and you have nothing and you say let's make a deal." In other words, there could be no deal made. He also stated, "If you do not get the charges dropped against me in the State of Kansas, I will be unable to testify against Paxton, should he come to trial in the State of Missouri" (T.Tr. 109–10).

During September, 1968, Hunter waived extradition and was released to the Missouri authorities for transfer to Missouri on the arrest warrant delivered by Mr. Lance. The Kansas authorities agreed to dismiss the Kansas firearm possession charge in exchange for Hunter's waiver of extradition. This arrangement was effected by Hunter's attorney in Kansas. The Missouri authorities played no part in securing the dismissal of Kansas charge.[14]

Hunter's preliminary hearing was held October 11, 1968. He was bound over for trial in the Circuit Court of Andrew County, Missouri, on the murder charge. On March 11, 1969, a hearing was held before Circuit Judge John M. Yeaman on Hunter's motion to suppress his statement. The motion was denied. Trial commenced before Circuit Judge Fred E. Schoenlaub on April 30, 1969. During the course of trial, a hearing was held to determine whether the statement was voluntary. Judge Schoenlaub found it was voluntary and admitted it into evidence. Hunter was found guilty by the jury. His conviction was affirmed on appeal to the Missouri Supreme Court. State v. Hunter, 456 S.W.2d 314 (Mo.1970). The issues presented in Hunter's habeas petition were considered by the Missouri Supreme Court on the appeal.

II. CONCLUSIONS OF LAW

■ A. Hunter's August 5 statement was made after he voluntarily, knowingly, and intelligently waived his constitu-

14. T.Tr. 72, 74.

tional rights under the Fifth and Sixth Amendments.

This conclusion is clearly and convincingly supported by the record. At every interview Hunter was expressly advised of his consititutional rights and he elected on each occasion not to exercise them. At the August 5 interview, Hunter was orally advised of his rights by Sgt. Shirley and by Sgt. Rhoades; he was asked to and did read a written form reciting his constitutional rights, including his rights to remain silent and to have the assistance of counsel; he replied affirmatively when asked whether he understood those rights; and he read and signed a written statement expressly waiving those rights. At the time of this interview, Hunter was over 21 years of age and had completed 11 grades of school. He was knowledgeable to a remarkable extent about criminal procedure as evidenced by his comments concerning the requirements for securing a search warrant and by his demand for a written promise of immunity. With several prior convictions to his credit (or discredit), Hunter was no stranger to criminal process. There is not the slightest indication in the record that Hunter was coerced in any manner to secure a waiver of his rights.

B. Hunter's August 5 statement was voluntary.

Hunter raises two contentions regarding the voluntariness of his statement. He contends that the statement was the product of repeated and protracted interrogations. This contention is not supported by the record. There is no evidence that the interviews were conducted under hostile, coercive, or oppressive conditions; nor does it appear that persistent relentless questioning was used to overbear Hunter's will to resist. Of particular note in this regard are the facts that Hunter voluntarily appeared at the Highway Patrol Headquarters in St. Joseph for questioning on several occasions and that Hunter himself summoned Sgt. Shirley to Atchison for the interview on August 5.

■ Hunter's principal contention regarding the voluntariness of his statement is that it was induced by a promise of leniency. This contention involves two standards of law. Considering the "totality of the circumstances," Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), if Hunter's statement was " 'obtained by any direct or implied promises, however slight,' " Bram v. United States, 168 U.S. 532, 542, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897), the statement was not voluntary; or if Hunter reasonably believed that a promise of leniency had been made to him, even though no such promise in fact had been made, and this belief induced his statement, the statement was not voluntary, Grades v. Boles, 398 F.2d 409, 412 (4th Cir. 1968); United States v. Harris, 301 F.Supp. 996, 999 (E.D.Wis.1969); United States ex rel. Caserino v. Denno, 259 F.Supp. 784, 790 (S.D.N.Y.1966).

These standards raise four questions. First, was an express or implied promise of leniency made to Hunter? Secondly, if no promise of leniency was made, did Hunter reasonably believe that such a promise had been made? Thirdly, if a promise was made or if Hunter reasonably believed that a promise had been made, was his statement induced by that promise in a "but for" sense? Fourthly, if a promise was made or if Hunter reasonably believed that a promise had been made, and this promise or belief induced his statement in a "but for" sense, was the inducing promise coercive? The record supports negative answers to all these questions.

■ First, no express or implied promise of leniency was ever made to Hunter. At the July 15 and 16 interviews, Hunter and Sgt. Shirley discussed the various charges that could be filed against Hunter for the Lyle murder. These discussions were initiated by Hunter. Although Sgt. Shirley did tell Hunter that he thought Mr. Lance would be willing to cooperate with Hunter,

Sgt. Shirley gave Hunter no assurances regarding the nature of the charges to be filed or the dismissal of the pending Kansas charge and he expressly stated to Hunter that he had no authority to promise anything. Only one comment during the August 5 interview bears any resemblance to a promise of leniency. This was the message from Mr. Lance related to Hunter by Sgt. Shirley. As the Court found, Sgt. Shirley told Hunter that it was possible Mr. Lance would consider charging Hunter with an offense less than murder if Hunter would cooperate and give a truthful statement and if Hunter was not directly involved in the murder. In the context of everything that happened from June 16 to August 5, this message cannot be contrued as a promise of leniency. It meant no more than the charges to be filed against Hunter would be influenced by the facts revealed in a truthful statement and a charge less than murder could be filed if the statement revealed that Hunter was not directly involved in the murder. This message was not an express or implied promise of leniency. This conclusion is considerably strengthened by the following conclusion that Hunter did not believe this message to be a promise of leniency.

■ Secondly, Hunter did not reasonably believe that a promise of leniency had been made to him. In all of Hunter's appearances in state court and in this Court, he has never said exactly what statement constituted the promise of leniency. At best, Hunter claims that the promise was not a "definite thing" and that he was merely "under the impression a reduced charge would be filed."[15] This "impression," according to Hunter, was based on Sgt. Shirley's statements during the July 16 interview.[16] It is clear, however, that Sgt. Shirley unequivocally told Hunter on July 16 that he had no authority to promise anything. The following is the only

thing Hunter claims about Mr. Lance's message of August 5: "On August 5 I think the only thing he [Sgt. Shirley] said about such cooperation was that Mr. Lance said that it was possible and that he gave me the impression that Mr. Lance was very willing to cooperate."[17] To be candid, the Court does not believe Hunter's claim that he was under the "impression" on August 5 that a reduced charge would be filed. The most telling fact in this regard is an exchange that occurred on August 5 between Sgt. Shirley and Hunter. Sgt. Shirley asked Hunter, before Hunter signed his statement, "what he thought would happen when this statement was signed and brought back [to Mr. Lance], in the event that the Andrew County Prosecuting Attorney saw fit to file a charge of first-degree murder."[18] Hunter's only response was that he could produce witnesses with alibi testimony and that he would claim that Sgt. Shirley had not advised him of his rights.[19] Hunter did not protest that a promise of leniency had been made and Hunter did sign the statement without objection. If Hunter truly believed that his statement was being given in exchange for a reduced charge, it is inconceivable that Sgt. Shirley's question would not have evoked instantaneous and vehement protest from Hunter. At the very least, Hunter would have refused to sign his statement. But Hunter did neither of these things. Hunter has never denied that Sgt. Shirley asked this question and he has never claimed that he made any other response than that indicated by Sgt. Shirley.

If no promise of leniency was made, why did Hunter make the incriminating statement on August 5? The answer is deceptively obvious. On July 15, Sgt. Shirley informed Hunter that Carl Paxton had named Hunter as the killer of Lyle. To Hunter, a professional criminal, this had all the appear-

15. T.Tr. 87.

16. T.Tr. 76.

17. T.Tr. 76.

18. T.Tr. 113.

19. T.Tr. 113.

ances of a common police ploy. However, when this was confirmed by Teresa Peak between July 16 and August 5 when she visited Hunter at the Atchison jail Hunter immediately asked her to contact Sgt. Shirley to tell him that he was willing to cooperate and that he wanted to see Sgt. Shirley. In light of this, Hunter's statement itself explains his motivation for making the statement without first securing the promise of leniency he had solicited on July 15 and 16:

> The sole reason I am making this statement is to protect myself from something I didn't do.

When the authorities are closing in, an investigation often becomes a race among the suspects to be the first to point the accusing finger, and every accuser will be accused in turn. The Court's opinion regarding Hunter's motivation is especially creditable in view of Hunter's stated belief that his statement would expose him only to a charge of accessory after the fact, a crime punishable by no more than five years imprisonment.

█ This discussion anticipated the Court's third conclusion. Assuming that a promise of leniency was made or that Hunter reasonably believed that a promise of leniency had been made, Hunter's statement was not induced by that promise or belief in a "but for" sense. Bram v. United States, 168 U.S. 532, 549, 18 S.Ct. 183, 42 L.Ed. 568 (1897), seems to suggest that a "but for" relationship between a promise and a confession renders the confession inadmissible. It is now exceedingly doubtful that this was the holding of *Bram*.[20] Nevertheless, the Court cannot conclude that Hunter would not have made his statement *but for* a real or imagined promise of leniency. All the evidence demonstrates that the sole motivation for Hunter's statement was to rebut Carl Paxton's indictment of Hunter as Lyle's killer. This is buttressed by many facts, including the following which have already been not-

ed: Teresa Peak confirmed Paxton's indictment of Hunter; Hunter then summoned Sgt. Shirley, saying that he was willing to cooperate; Hunter expressly stated that the "sole reason" for his statement was to protect himself; and Hunter believed that his statement exposed him only to a charge of accessory after the fact.

█ Fourthly, assuming that a promise of leniency was made or that Hunter reasonably believed that a promise had been made, and further assuming that a "but for" relationship existed between the promise or belief and the statement, the inducement for the statement was not constitutionally impermissible because it was not coercive. More than a "but for" relationship is required to bar an admission or confession from evidence. The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency. This is amply illustrated by the Supreme Court's treatment of promise-induced guilty pleas, *i. e.* judicial confessions. The mere fact that a guilty plea is induced by a promise of leniency does not render the plea involuntary. Santobello v. New York, 404 U.S. 257, 261–262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); Brady v. United States, 397 U.S. 742, 749–755, 90 S.Ct. 1463, 25 L. Ed.2d 747 (1970). The question in "plea bargaining" situations is not whether the guilty plea would have been made *but for* the promise of leniency, but whether the promise was coercive in nature, *i. e.* whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action. This is not often an easy question to answer for the Supreme Court has provided no guidance regarding the nature of coercive promises:

> But it is also clear that a prosecutor's promise may deprive a guilty plea of the "character of a voluntary act." . . . The decisions of this

---

20. See text at 301, *infra*.

Court have not spelled out what sorts of promises by prosecutors tend to be coercive. . . .

Santobello v. New York, *supra*, 404 U.S. at 266, 92 S.Ct. at 501 (Douglas, J., concurring).

The Court knows of no justification in logic or policy for distinguishing admissions and confessions from guilty pleas. The Fifth Amendment condemns only compulsion:

> Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence.

Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). If it can be said that an admission or confession was induced in a "but for" sense by a promise of leniency, but that promise was not a compelling influence, then introduction of the admission or confession at the accused's trial does not contravene the command of the Fifth Amendment.

The Court is not unmindful of Bram v. United States, *supra*. The *Bram* Court held that a confession " 'obtained by any direct or implied promises, however slight,' " was not voluntary. 168 U.S. at 542–543, 18 S.Ct. at 187. In determining that the confession in that case was so " 'obtained,' " the *Bram* Court appeared to apply a simple "but for" test; that is to say, if the confession would not have been given but for the promise, then it must be excluded from evidence. 168 U.S. at 549, 18 S.Ct. 183. Such a test clearly overlooks the narrower question of compulsion. If this was the *Bram* Court's holding, it was based on the rationale that " 'the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner.' " 168 U.S. at 543, 18 S.Ct. at 187. Today *Bram* is not viewed as proscribing admission of all promise-induced confessions. The Supreme Court has expressly recognized that "*Bram* and its progeny did not hold that the *possibly* coercive impact of a promise of leniency could

not be dissipated by the presence and advice of counsel." Brady v. United States, *supra*, 397 U.S. at 754, 90 S.Ct. at 1472 (emphasis added). If *Bram* did not hold this, then *Bram* cannot be read as foreclosing inquiry into the question of compulsion when all that is shown is a "but for" relationship between a statement and a promise.

Furthermore, the rationale of *Bram* will not stand in the face of the Supreme Court's decisions on "plea bargaining." To say that the law cannot measure the possibly coercive impact of a promise of leniency would require the conclusion that guilty pleas induced by a promise of leniency must be rejected without exception. That is not the teaching of *Brady* and *Santobello*. If the courts are able to determine whether a guilty plea was induced coercively by a promise of leniency (something this Court has done hundreds of times), then the courts are also able to determine whether an admission or confession was coercively induced by a promise of leniency.

■ The Court will apply the same test to Hunter's statement that is applied to all challenged admissions and confessions: the question is whether the conduct of the state's agents was such that it overbore the defendant's will to resist and brought about an admission or confession not freely self determined. Rogers v. Richmond, 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961); Fernandez-Delgado v. United States, 368 F.2d 34, 36 (9th Cir. 1966).

■ The Court concludes without the slightest hesitation that Hunter's will to resist was not overborne in any degree by a promise of leniency. If a promise of leniency was made to Hunter, it was the product of his experienced and calculated solititation. At the July 15 and 16 interviews, Hunter was the one who initiated the discussions of a deal. He made the offer to confess in exchange for a reduced charge. He enticed the Missouri authorities with claims that he knew who killed Lyle and

that he knew where the murder weapon could be found. If Mr. Lance's message of August 5 was a promise to consider filing a reduced charge against Hunter in exchange for his statement, it was a promise solicited freely and voluntarily by Hunter himself. Hunter cannot now be heard to say that in accepting that promise he was the victim of compulsion.[21]

For the reasons stated, it is

Ordered that petitioner's application for a writ of habeas corpus be, and hereby is, denied.

---

21. *Accord*, Taylor v. Commonwealth, 461 S.W.2d 920, 922 (Ky.1970).