IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2002

## STATE OF TENNESSEE v. JAMES L. CARRETHERS

**Appeal from the Criminal Court for Davidson County**
**No. 2000-A-495     J. Randall Wyatt, Jr., Judge**

_____

**No. M2001-01503-CCA-R3-CD - Filed October 2, 2002**

_____

James L. Carrethers appeals his second-degree murder conviction.  He was found guilty of that offense by a Davidson County Jury.  He is presently serving an eighteen-year sentence in the Department of Correction for the crime.  In this direct appeal, he claims that the evidence does not sufficiently support the conviction and that the lower court erred in denying a motion to suppress his inculpatory, pretrial statements.  Because we are unconvinced of error in either respect, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Monte D. Watkins, Nashville, Tennessee, for the Appellant, James L. Carrethers.

Paul G. Summers, Attorney General & Reporter; Renee W. Tucker, Assistant Attorney General; William L. Gibbons, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

In the light most favorable to the state, the evidence at trial demonstrated that on the evening of September 2, 1999, the defendant was in the vicinity of the Trimble Street residence of the victim, Sarah Owens.  Apparently, the defendant was drinking gin and using crack cocaine.

According to a pretrial statement given by the defendant, he saw his cousin, Ronald "Bay Bay" Woodard, and another individual, "Champ."  Mr. Woodard told the defendant that his relationship with his live-in girlfriend, Sarah Owens, had become strained because of Mr. Woodard's extracurricular relationship with Lisa Sanders. Mr. Woodard told the defendant that Ms. Owens was threatening to inform Mr. Woodard's parole officer about his drug-dealing activity.  Mr. Woodard told Johnny "Little Johnny" Maupin to kill the victim.  Apparently, Little Johnny was supposed to

shoot the victim, although the defendant was to assist him in committing the crime and would receive drugs as compensation for his involvement.

The defendant admitted in a pretrial statement that he and Little Johnny went to the residence where the victim and Mr. Woodard lived. The defendant kicked the door in, and Little Johnny shot the victim. What transpired during the course of the crime is by no means clear, but the victim ended up lying on the lawn, where she was discovered by Mr. Woodard and Ms. Sanders, after they heard gunshots.

John Thomas Allen, Sr., who lived near the residence of the victim and Mr. Woodard, knew the defendant, and shortly before hearing shots in the neighborhood, Mr. Allen asked the defendant and a companion to leave Allen's home. Mr. Allen went to bed, and before falling asleep, he heard gunshots. He fell asleep, and a short time later awakened to find the defendant inside his home. The defendant was in Mr. Allen's bathroom washing something red that appeared to be blood from a white t-shirt. Mr. Allen overheard the defendant ask Mr. Allen's roommate for another shirt. The defendant left the house but came back the next morning to retrieve the shirt he had washed in Mr. Allen's bathroom.

The victim sustained gunshot wounds to the left side of the neck and the left side of the abdominal region. Surgery to save her life was unsuccessful.

The victim's home was ransacked, and there was evidence that Mr. Woodard had a large quantity of drugs stored there. However, the drugs were not taken, and the authorities recovered the drugs during the course of gathering evidence and processing the crime scene.

Around the break of dawn on September 3, 1999, Randall Bowen, a homeless man, saw the defendant searching for something in the alley behind the victim's home. The defendant told Mr. Bowen that he was looking for a puppy and asked Bowen to help. Mr. Bowen declined and walked up the street, but a few minutes later he returned and assisted the defendant in his search when the defendant offered Bowen drugs to help him find a blue bandanna. They found the bandanna in the alley half a block from the victim's house. It was wrapped around a handgun.

The day after the homicide, the defendant talked to Chevelle Jones, who expressed an interest in obtaining a weapon for protection in the wake of the victim's shooting. The defendant said he could get a gun for Mr. Jones. Later, the defendant came to Mr. Jones' home with a .38 caliber handgun, which he sold to Jones for $80 in the presence of Juanita Rucker, Jones's live-in girlfriend.

Shortly thereafter, Mr. Jones saw some police officers taking the defendant into custody. He spoke with them, and thereafter he turned the gun over to them. This weapon was later identified by a weapons expert as being the weapon which fired a projectile that was recovered from the victim's body.

A shoe print on the door of the victim's house was compared with shoes that the defendant was wearing at a later time, and the print was later determined to be consistent with those shoes.

The defendant was first questioned by Metro Police Officers on the afternoon of September 3, 1999. He was released, but he was questioned a second time that evening. The defendant admitted some involvement in the victim's homicide. He claimed that he had been present when the victim was shot, and he identified his cousin, Ronald Woodard, as the shooter. As a result of this questioning, the defendant was placed under arrest.

The defendant was next questioned on September 9. At that time, he said that the shooter was Johnny Maupin, not Ronald Woodard. He admitted that he knew that Maupin was going to harm the victim, but he did not know whether she was to be beaten or killed. The defendant admitted that he kicked the victim's door open and that he was to receive drugs for his assistance in the crime. He claimed, however, that he fled after kicking the door, and he was in John Thomas Allen's living room by the time gunshots were fired. The defendant admitted selling the murder weapon to Chevelle Jones, and he claimed that he got it from Ronald Woodard.

By the time of trial, the defendant had disavowed his culpability for the crime, notwithstanding his pretrial admissions. He maintained at trial that he was "blocks and blocks away" at the time of the crime, and he never went to the victim's house that evening. He claimed that at the time of the crime, he was standing in a parking lot drinking. He admitted that he was at Mr. Allen's house earlier in the evening, but he denied having a bloody t-shirt there during the evening. The defendant claimed that shortly before one o'clock in the morning, Mr. Woodard approached him and gave him a weapon wrapped in a blue bandana, which the defendant placed in some bushes. Within a couple of hours, Mr. Woodard approached the defendant in the presence of a police officer and demanded to know where the gun was. After the two scuffled, the defendant was taken to the police station and questioned. Apparently, the defendant believed that Mr. Woodard was trying to "set him up" as the perpetrator of the crime.

The defendant maintained in his trial testimony he was coerced into giving his pretrial statement in which he admitted being present at the time of the crime and in which he identified Johnny Maupin as the killer because he was told that he would be released if he would give a statement. He claimed that he was misled into believing that he would be treated as a witness, rather than a perpetrator. Further, he claimed that he identified Maupin as the triggerman because he had heard that Maupin recently had been killed, and he was not enthusiastic about maintaining his earlier identification of Mr. Woodard as the shooter. The defendant theorized that the promises made to him by the detectives who took his statement were either edited out of the tape that was played for the jury or never recorded.

The defendant asserted that the true version of events was that he was not present when the crime took place and had nothing to do with it. After the crime had transpired, Mr. Woodard told the defendant in the presence of Lisa Sanders that Woodard and the victim had an

altercation which culminated in Woodard accidentally shooting the victim. The defendant admitting selling the gun to Chevelle Jones. He claimed that the shoe print on the door of the victim's home did not come from shoes that he owned.

The jury rejected the defendant's disavowal of involvement in the crime. On the charge of premeditated murder, it returned a verdict of guilty to the lesser- included offense of second-degree murder. The defendant was sentenced to serve an eighteen-year incarcerative term. After the lower court denied his motion for new trial, he appealed.

# I

We first consider the defendant's challenge to the sufficiency of the evidence. When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990), *overruled on other grounds by State v. Hooper*, 29 S.W.2d 1, 8 (Tenn. 2000).

In determining the sufficiency of the convicting evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. *Id*. at 835. In *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973), our supreme court said, "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilty due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. *Id*.

A crime may be established by direct evidence, circumstantial evidence, or a combination of the two. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). Before an accused may be convicted of a criminal offense based upon circumstantial evidence, the facts and the

circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "A web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." *Id*. at 484, 470 S.W.2d at 613.

The crime of which the defendant is convicted is second-degree murder. As pertinent here, that crime is "[a] knowing killing of another . . . ." Tenn. Code Ann. § 39-13-210(a)(1) (1997). As likewise pertinent here, an individual may be held criminally responsible for the conduct of another if, "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense . . . ." Tenn. Code Ann. § 39-11-402(2) (1997).

The defendant claims that the case against him is entirely circumstantial and that there is no evidence of his guilt of any offense greater than facilitation of second-degree murder. Facilitation occurs when an individual, "knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), . . . knowingly furnishes substantial assistance to the commission of the felony." *Id*. § 39-11-403(a) (1997). In support of his argument, the defendant recites that he did not know the specific crime that was to be committed, that the proof shows that the extent of his involvement was kicking in the door, and that he did not have the intent to promote, assist or benefit from the offense.

Upon review of the evidence in the light most favorable to the state, we cannot agree with the defendant's minimalist view of his culpability. At least one of the defendant's statements was ambiguous whether he knew ahead of time that the victim was to be killed;[1] the jury had the opportunity to evaluate those statements and accredit the one it found more truthful. The defendant admitted that he knew Mr. Maupin had been instructed by Mr. Woodard to "get that b---- or do that b----, or something like that." The defendant also admitted that Mr. Maupin told him that Mr. Woodard "wanted me to go over there and take care of this s---." Moreover, the jury had the opportunity to draw inferences from the evidence presented that the defendant was not completely forthcoming about his involvement in the crime. There was evidence that the defendant's involvement was more extensive than portrayed in his pretrial statements and trial testimony; he was seen washing a substance appearing to be blood from a t-shirt at a nearby home shortly after the victim was shot. Pretrial he admitted that he kicked in the door, but at trial he denied it. He denied that the shoe print on the door was his, but there was evidence that the print matched the soles of shoes he was wearing when he was questioned after the crime. A homeless man testified that he and the defendant searched for and located a weapon, and the defendant denied this took place. The homeless man identified the weapon as being wrapped in a blue bandana, which is consistent with other evidence about the murder weapon.

---

[1] When asked in the September 9 interview the identity of the person who shot the victim, the defendant responded, "Little Johnny was supposed to. Little Johnny was ordered to do it."

This case was one in which the credibility of witnesses was crucial. If the defendant's credibility on the issue of the extent of his involvement in the crime is rejected, there is ample evidence from which the jury could infer that the defendant knew that he was going with Mr. Maupin to the victim's home for the purpose of killing her. *See* Tenn. Code Ann. § 39-11-302(b) (1997) ("A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result."). The defendant substantially assisted Mr. Maupin by kicking open the door to the victim's home and was further involved in the shooting as evidenced by the bloody t-shirt. The defendant was compensated with drugs for his involvement. In other words, there is sufficient evidence to sustain a conviction of second-degree murder via a criminal responsibility theory.

**II**

The defendant's remaining issue concerns the trial court's denial of his motion to suppress his September 9 pretrial statement. He argued below that his Fifth Amendment privilege not to incriminate himself and his Sixth Amendment right to counsel were violated. On appeal, he pursues only the Fifth Amendment claim, and we will therefore limit our discussion to that claim.

The defendant claims that he was promised that he would be released if he would make a statement, and he made his inculpatory statement because he believed doing so would afford him leniency. Further, the defendant claims that the detectives who interviewed him were overbearing when they told him that they had his footprint from the crime scene, and no physical evidence of this footprint was ultimately introduced at trial. He complains that his will to resist was overborne by the behavior of state actors.

At a suppression hearing, the trial court is the trier of fact, and its factual findings are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 22 (Tenn. 1996); *State v. Aucoin*, 756 S.W.2d 705, 710 (Tenn. Crim. App. 1988). Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. *Odom*, 928 S.W.2d at 23. On appeal, the defendant has the burden of showing that the evidence preponderates against the trial court's determination. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984). However, the application of the law to the facts is subject to *de novo* review on appeal. *Daniel*, 12 S.W.3d at 423.

When a defendant claims that his statement was compelled by coercive police tactics via promises of leniency, the pertinent inquiry is not merely whether the statement was made only as a result of such promise. *State v. Kelly*, 603 S.W.2d 726, 729 (Tenn. 1980). Rather, it is "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." *Id.* (quoting *Hunter v. Swenson*, 372 F. Supp. 287, 300-01 (W.D. Mo. 1974)); *see State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

The record reflects that on September 9, the defendant signed a rights waiver form, after which the defendant gave an inculpatory statement. Detective Roy Dunaway testified that the defendant was never promised that he would be released if he would make a statement. However, the defendant was told that if he cooperated with the authorities, it would help him.

The defendant testified that Detective Dunaway told him he would release the defendant if the defendant would give a statement. The defendant claimed that he wanted to go home, so he made up a story to satisfy the detectives. The videotape of the statement was shown at trial, and it clearly reflects that the defendant was not initially forthcoming about the crime, and the detectives who questioned him had to confront him with inconsistencies in his version of events and other evidence in order to obtain information from him. However, noticeably absent are any promises as the defendant alleges were made.[2] Furthermore, there is nothing on the tape to suggest that the defendant's free will to decline to make a statement was overcome by the detectives.

The lower court found that the defendant did not carry his burden of demonstrating that his will was overborne, that he was coerced, or that any unrealistic promises were made. Thus, to the extent that the defendant claimed that promises were made to him which were not recorded on tape or edited from the tape, the judge found his testimony incredible.[3] On appellate review, we cannot say that the evidence preponderates against the lower court's determination. Thus, the lower court properly denied the motion to suppress.

Therefore, we affirm the defendant's second-degree murder conviction.

---

[2]In fact, the evidence suggests the contrary. About one-half way through the one hour and twenty minute interview, after the defendant admitted some minimal involvement in the crime, Detective Brad Putnam said

> [Y]ou've already dug you a hole, in a way, as far as admitting to your participation, although it wasn't that much. Kicking that door in still makes you just as guilty as the triggerman. It's just that what normally happens is that the triggerman is going to get more jail time than the other guy, in most cases.
> . . .
> [Y]ou're still going to go down for murder. You might not get near as much time, but the thing is you still participated by going over there.
> . . .
> You need to go ahead and tell us the truth, the whole story.

The detectives continued to tell the defendant that he had inculpated himself and implored him to be completely forthcoming with them. The defendant continued to talk to the detectives for an extended period of time after these statements were made by the detectives.

Near the end of the interview, the defendant inquired about what type of protection he will receive from other jail inmates. We interpret these inquiries as indicating that the defendant did not have an expectation that he was about to be released at the conclusion of the interview.

[3]The defendant does not expound in his brief on the significance he places on the lack of presentation at trial of physical evidence of the footprint on the door. Although he is correct that the door bearing the footprint itself or a photograph of it was not introduced, there was testimony about the footprint and its consistency with the defendant's shoes.

_____
JAMES CURWOOD WITT, JR., JUDGE