IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 11, 2004

## STATE OF TENNESSEE v. ZINA BETH FINNELL

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2001-D-2342     Seth Norman, Judge**

---

**No. M2003-01997-CCA-R3-CD - Filed September 30, 2004**

---

This is a direct appeal from a conviction of facilitation to commit felony murder. The Defendant, Zina Beth Finnell, was indicted for felony murder by a Davidson County Grand Jury in connection with the murder of her step-father during the commission of an aggravated burglary. A jury convicted the Defendant of facilitation to commit felony murder, and the trial court sentenced her to 21 years. On appeal, the Defendant argues two issues: (1) the trial court erred in denying the Defendant's motion to suppress her statement to the police, and (2) there was insufficient evidence to find the Defendant guilty of facilitation to commit felony murder. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Dwight Scott, Nashville, Tennessee, for the appellant, Zina Beth Finnell.

Paul G. Summers, Attorney General and Reporter; Richard H. Dunavant, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

The victim, a 71-year-old retired state worker, was shot three times during the course of a burglary at his home in Nashville in the early morning hours of April 7, 2001. His wife of 17 years witnessed the home invasion, the ensuing gun battle between her husband and an armed intruder, and the infliction of her husband's fatal gun shot wounds. The victim was transported by emergency response personnel to Vanderbilt University Hospital where life saving measures ultimately proved unsuccessful. Investigation of the case was assigned to Detective Bill Pridemore of the Nashville Metropolitan Police Department.

Within a few hours of the crime, Detective Pridemore interviewed the victim's wife and observed the crime scene. Detective Pridemore's first observations focused on the probable point of entry, an outside door leading into the kitchen which was forcibly opened, and more notably a room filled with firearms. Responding police officers estimated over 200 firearms of various types along with ammunition. The official police inventory accounts for 109 guns. The door to this "gun room" was equipped with an alarm that had been tripped during the home invasion.

Detective Pridemore's investigation revealed that the victim supplemented his retirement income by selling dogs, lawn mowers and guns out of his home. The victim often ran classified advertisements in the local newspaper advertising the various items he had for sale. These advertisements contained his home phone number, but not his street address. Because there were no immediately obvious suspects in the case, Detective Pridemore initially began his investigation by obtaining telephone records and talking to people who had recently responded to the victim's newspaper ads as well as the victim's neighbors and family. The detective talked to the Defendant, who is also the victim's step-daughter, for the first time the day of the homicide. During this first interview, the Defendant informed the detective that she knew nothing about the crime.

The Defendant had a rocky relationship with her mother and step-father prior to the victim's homicide. Due to her own health concerns, the Defendant's mother gave the Defendant up for adoption at age seven. The Defendant's paternal grandparents adopted her, but she was allegedly molested by her grandfather and later transferred to state custody at age thirteen. The Defendant's mother said she was not allowed to make any contact with the Defendant until she was nineteen. As an adult, the Defendant lived briefly with her mother and step-father on several different occasions. She had stolen guns and money from them in the past. The Defendant had received several prior criminal convictions in recent years ranging from theft to prostitution, was a parole violator, and admitted to having a marijuana habit.

Several weeks after the homicide, Detective Pridemore's investigation was, by his own admission, stalled with no strong suspects and few leads. He decided to backtrack and re-interview many of the same people again with the hope that they may have heard something of interest in the

weeks since the homicide--a standard investigative technique. He contacted the Defendant and asked for a second interview with her to be conducted at the police station. The Defendant agreed to an interview the morning of April 30, 2001. At this second interview, the Defendant initially maintained her original statements that she did not know anything about the burglary or homicide. However, when Detective Pridemore mentioned that some of her earlier statements did not match with information provided by other parties he had interviewed, the Defendant informed him she wanted to make a statement describing what "really happened." The detective turned on a video recording device and taped this statement, which later became the subject of a motion to suppress.

In her video-taped statement to Detective Pridemore, the Defendant described a group of four individuals who came to her and her roommate's house either late evening of April 6th or early morning of April 7, 2001, to inquire about the Defendant's mother and step-father's house, which was known to contain a large collection of guns. The Defendant personally knew two individuals in this group, Alicia Burke and Barry Brown, but had never met the other two men, later identified as Justin Mills and Travis Barton. At least two of the individuals carried firearms, one of which was described as an AK-47 assault-style weapon and the other a handgun. The group declared they had just returned from robbing Hispanics but were unhappy because they believed they were not getting enough money through this venture.

The Defendant testified that Alicia Burke and Barry Brown already knew that the Defendant's step-father had a large and valuable gun collection, and had apparently informed the other two members of their group of this fact. The Defendant claims the group already knew where the victim's house was when they came to see her, however the record is unclear as to this point. Regardless, the Defendant gave the group the victim's street address and a description of the house and vehicles owned by the victim. According to the Defendant, the group was at her house for about five minutes. The Defendant also claims she thought the group might be going home when they left her house, because no one in the group expressly said they were going directly to the victim's house. However, the Defendant's roommate, Ms. CJ Jones, testified that as the group was leaving the Defendant stated, "just don't hurt my mother," and also later said "I think they are going to do something, I hope and pray they don't." Ms. Alicia Burke later testified that the Defendant had told the group she did not care if they went to her mother and step-father's house but she "didn't want anything to do with it."

As a result of the Defendant's statement, Detective Pridemore was able to gather sufficient evidence for a grand jury to indict the Defendant and all four members of the group who participated in the burglary for felony murder. Before trial, the Defendant filed a motion to suppress her second statement to Detective Pridemore, alleging it was involuntarily induced by promises not to prosecute. A suppression hearing was conducted and the trial court subsequently overruled the motion to suppress. A two-day jury trial was conducted at the conclusion of which the Defendant was convicted of the lesser-included offense of facilitation to commit felony murder. At a separate sentencing hearing the Defendant received a 21 year sentence as a Standard, Range I offender. Defendant timely filed a motion for a new trial and notice of appeal. The Defendant now argues on appeal that the trial court erred in denying her motion to suppress and that the evidence presented

at trial was insufficient to support a finding of guilty of facilitation to commit felony murder beyond a reasonable doubt.

## I. MOTION TO SUPPRESS STATEMENT

The Defendant's first issue on appeal is whether the trial court erred in denying her motion to suppress the statement she made to the police detective. The Defendant asserts that her inculpating statement was the product of coercion because it was induced by the police interrogator through promises that she either "could" not or "would" not be prosecuted. Thus, the Defendant contends, the statement was involuntary and should have been suppressed. We disagree.

Because the issue of whether a confession was given voluntarily is primarily an issue of fact, review of the grant or denial of a motion to suppress is conducted using the following standards:

> [q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). See also State v. Walton, 41 S.W.3d 75, 81 n.3 (Tenn. 2001)("To be clear, the standard of appellate review for findings of fact at a suppression hearing is that articulated by this Court in Odom." However, the "[t]estimony presented at trial may be considered by an appellate court in deciding the propriety of the trial court's ruling on a motion to suppress." State v. Perry, 13 S.W.3d 724, 737 (Tenn. Crim. App.1999). Furthermore, our review of the trial court's application of the law to the facts is a question of law which we conduct under a de novo standard of review. See Sate v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997). On appeal, the Defendant bears the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. See Braziel v. State, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

The Fifth Amendment to the United states Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const art. I, § 9. While our supreme court has "traditionally interpreted article I, § 9 to be no broader than the Fifth Amendment," State v. Martin, 950 S.W.2d 20, 23 (Tenn. 1997), it has also held that one "significant difference between these two provisions is that the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Even though a statement was not given as a result of custodial interrogation, the statement must still be voluntary in order to be admissible. See Arizona v. Fulminante, 499 U.S. 279, 286-88 (1991). In order to be considered voluntary, the statement must not be extracted by "any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." Bram v. United States, 168 U.S. 532, 542-43 (1897). However, the Tennessee Supreme Court emphasized: "[b]ut, not all promises by state officers of leniency render involuntary confessions thereby induced." State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980).

In Tennessee, "[p]romises of leniency by state officers do not render subsequent confessions involuntary per se: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are compelled by promises of leniency.'" State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996) (citing, Kelly, 603 S.W.2d at 729) ((quoting Hunter v. Swenson, 372 F.Supp. 287, 300-01 (D.C. Mo. 1974) (emphasis added)). In determining whether or not a promise of leniency has "compelled" a statement, Tennessee courts must examine "whether the behavior of the state's law enforcement officials was such as to overbear [the accused's] will to resist and bring about confessions not freely self-determined." Kelly, 603 S.W.2d at 728 (quoting Rogers v. Richmond, 365 U.S. 534, 544 (1961). Additionally, "[a] defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." Smith, 933 S.W.2d at 455. Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." Id.

When a defendant claims that a statement was compelled by the coercive police tactic of promises of leniency, the pertinent inquiry is not merely whether the statement was made only as a result of such promises. See Kelly, 603 S.W.2d at 729. Rather the standard is "whether the accused was so gripped by the hope of leniency that he did not or could not freely and rationally choose among the available courses of action." Id. (quoting Hunter v. Swenson, 372 F.Supp. 287, 300-01 (D.C. Mo. 1974); see also Smith, 933 S.W.2d at 455.

In determining issues of voluntariness, the particular circumstances surrounding each confession or statement must be examined. See Monts v. State, 400 S.W.2d 722, 733 (Tenn. 1966). Whether a statement was voluntarily given is determined by examining the totality of the circumstances. See Kelly, 603 S.W.2d at 728-29.

In the case presented, the Defendant claims that at her first interview the police detective, Mr. Pridemore, assured her that he "saw no reason as to why there would be any prosecution" and informed her that she ". . . couldn't get in trouble for talking and giving information." The Defendant further claims that at the second interview–the fruits of which she desires suppressed–Detective Pridemore told her "as long as I told him the truth, and that–do not lie to him about whether or not I was with them, that it would help me more than hurt me." The Defendant further testified at the suppression hearing that she understood she would not be prosecuted if she told the truth, stating: "he [Detective Pridemore] told me that I could not get in trouble for talking." Finally, the Defendant testified that if she had known she could be prosecuted, she would not have made her inculpating statement to the police.

The State argues that during the suppression hearing the Defendant herself admitted that Detective Pridemore advised her that the decision to prosecute "would fall to the D.A." Furthermore, the State asserts that the evidence on record shows that the Defendant knew at the time of the interview she was not under arrest, and that the Defendant provided her statement voluntarily.

After considering the evidence presented at the hearing on the motion to suppress, the trial court made several written findings of fact. The trial judge found that the police detective had no reason to suspect the Defendant of any involvement with the crime until after she came forward "with the information which implicated her in the felony-murder of her stepfather." He further noted the Detective credibly testified that "the Defendant's statements were made totally voluntarily and [he] was, in fact, surprised by what she [the Defendant] had to say." The trial court noted that during the hearing "defense counsel attempted to elicit testimony from the defendant that Detective Pridemore 'promised' her she could not be prosecuted if she made these statements, but it was clear that what he may have said in the interview did not amount to such." The trial court found it significant that when asked if the detective ever promised her she "couldn't" be prosecuted if she made a statement, the most the Defendant would testify to was that the detective told her she "wouldn't" be prosecuted if she came forward with information. Labeling the distinction between the two words important, the trial court concluded that the Defendant was never compelled by absolute certainty that she would not be prosecuted. Rather, the Defendant admitted that while she was under the impression she would not be prosecuted, she "also understood that the issue was not within Detective Pridemore's control." Thus, the trial court ruled that the Detective never induced statements from the Defendant through a promise not to prosecute, and overruled the Defendant's motion to suppress.

Upon review of the record preserved for appeal, we find no evidence of coercive police activity, no law enforcement behavior such as would overbear the Defendant's will to resist giving a statement, nor do we find the Defendant so "gripped by the hope of leniency" that she could not freely and rationally choose not to give the statement she did. It is noteworthy that the transcript of the second interview between Detective Pridemore and the Defendant--the object of the suppression motion-- is completely void of any statement even resembling inducements to testify or promises of leniency. Rather, as the following excerpts from the beginning of the interview suggest, the transcript reveals a suspect who wanted to make a statement of her own volition:

> DETECTIVE: Now, you say you want to tell me about the incident, tell me what you know, right?
> FINNELL: Yes, sir.
> DETECTIVE: And, I explained to you earlier, you're not under arrest.
> FINNELL: Yes, sir.
> DETECTIVE: Now, what I want–you say you have some information about what happened. And we talked about being Truthful.
> FINNELL: Yes, sir.
>     . . .

DETECTIVE: All right.  Okay, Zina.  Now, what I want you to do . . . you've had a cigarette break.  And, you said you wanted to tell me about what you know.
FINNELL:    Right.

The suppression hearing transcript also fails to reveal any oppressive police conduct or coercive promises of leniency.  Detective Pridemore testified that he never told the Defendant she would not be prosecuted prior to turning on the video recorder and questioning her.  To the contrary, he informed the Defendant that her statement would be reviewed by the District Attorney's Office for determination as to whether it warranted presentment to a grand jury.  He further testified that toward the end of their discussions the Defendant stated "Well I hope that I'm not – that it is not presented to the grand jury, but if it is, then, I will deal with it."  Detective Pridemore also testified that he believed the Defendant's statement was voluntary, and he in no way desired to trick the Defendant into giving a confession.  The trial court found Detective Pridemore's testimony credible.

The Defendant's own testimony at the suppression hearing fails to support her claim of an induced confession through promises of leniency.  At the hearing the Defendant's counsel asked her on direct if Detective Pridemore made "any promises" that he was not going to prosecute, to which the Defendant did not respond affirmatively, but rather stated that the Detective simply told her he saw no reason why there would be prosecution, but that it was ultimately up to the D.A.   The Defendant's counsel then asked her if Detective Pridemore made any "definite statements" regarding whether he would seek to prosecute, to which the Defendant again failed to affirmatively reply, claiming only that the Detective told her telling the truth would help her more than it would hurt her.  The Defendant's counsel finally received an affirmative answer on his next question, when he asked the Defendant: "Did you make the statement to him voluntarily?"  The Defendant replied "Yes, sir."

Later in the suppression hearing the Defendant did state that she "understood" she would not be prosecuted if she told the truth, and that if she had known she could be prosecuted she would have "asked for an attorney," (apparently instead of making the statement).  However, the Defendant failed to allege anything resembling a promise not to prosecute and furthermore admitted that the Detective informed her such decisions were ultimately out of his control.

Upon considering the facts in a light most favorable to the State, we must conclude that the Defendant has failed to demonstrate that the evidence preponderates against the trial court's determination that her statement was voluntary and not induced by the police through promises of leniency.

The Defendant testified that she understood she would not be prosecuted if she simply told the truth.  However, it is well settled law that a "defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense.  Smith, 933 S.W.2d at 455.  The record clearly reveals that Detective Pridemore did not promise the Defendant she could not be prosecuted, but rather correctly stated that such decisions were made by the District Attorney's

Office. This objective evidence is of substantially more significance than the Defendant's own subjective inferences and perceptions. Additionally, the Defendant bears the burden of establishing "coercive police activity" in order to show a confession was not voluntary, and none of the statements made by Detective Pridemore even approach what could be considered coercion. See id.

Here, the Defendant admitted at the suppression hearing that she voluntarily accompanied the detective to the Police Station, she fully understood she was not under arrest, and gave her unsolicited statement. On appellate review, we cannot say that the evidence preponderates against the trial court's determination that her statement was made voluntarily. Thus, this issue has no merit.

## II. INSUFFICIENT EVIDENCE

The Defendant's second issue on appeal is whether there was sufficient evidence for any reasonable trier of fact to find beyond a reasonable doubt that the Defendant was guilty of facilitation to commit felony murder. The Defendant maintains that because she was not sure the group was going to the victim's house after they left her presence, and because some of the perpetrators of the aggravated burglary and murder already knew the general location of the victim's house and its contents, the Defendant's provision of the address and other details failed to rise to the level of knowingly furnishing substantial assistance as required by the criminal statutes. We disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from

circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant was indicted for felony murder and convicted by a jury of the lesser-included charge of facilitation to commit felony murder. Felony murder is a killing committed during the perpetration of a felony, such as aggravated burglary as in this case. See Tenn. Code Ann. § 39-13-202(a)(2). Burglary is the entry of a building other than a habitation with the intent to commit a felony, theft or assault therein. See Tenn. Code Ann. § 39-13-402(a)(1). Aggravated burglary is the burglary of a habitation. See Tenn. Code Ann. § 39-13-403(a). Facilitation of a felony is knowing that another person intends to commit a felony, and knowingly furnishing substantial assistance in the commission of the felony.[1] See Tenn. Code Ann. § 39-11-403(a).

In the present case the facts are undisputed that there was a killing committed during the perpetration of the felony of aggravated burglary. However, the Defendant challenges the jury determination that there was sufficient evidence to prove beyond a reasonable doubt both, (1) that the Defendant knew that another person was going to commit a felony, and (2) that the information provided by the Defendant constituted "substantial assistance" toward the commission of the felony. Specifically, the Defendant asserts she disclaimed all involvement by stating she wanted nothing to do with it, "it" being the planned burglary of her mother and step-father's house. Second, the Defendant claims she had no knowledge that a felony was about to be committed because after providing the group with information about her step-father's house, the group left and she did not know where they went or what they were about to do. Finally, the Defendant claims that the information she gave the group did not amount to "substantial assistance" because they already knew that the victim owned a large collection of guns, and more significantly, they already knew where the victim's house was located.

The Defendant's claim of error based on the fact that she wanted nothing to do with the burglary fails because facilitation does not require direct participation in the crime. Indeed, the Defendant's statement that she wanted nothing to do with the planned burglary is evidence that the Defendant did in fact "know" that other persons were intent on committing a felony.

The Defendant's second claim is that she had no knowledge a felony was about to be committed because after the group's departure from her house she was unsure as to where they were going or what they planned to do. However, given the entirety of the circumstances, we find this assertion to be without merit. The group of four individuals came to her house late at night carrying an AK-47 assault weapon and a handgun. They bragged that they just returned from robbing Hispanics, but were displeased with the amount of money they collected. They told the Defendant they wanted more guns and a bigger score in their next robbery. They told the Defendant they knew

---

[1] But, "without the intent required for criminal responsibility under § 39-11-402(2)." Tenn. Code Ann. § 39-11-403(a). Tennessee Code Annotated section 39-11-402(2) states that a person is criminally responsible for the offense of another if "[a]cting with intent to promote or assist the commission of the offense, or to benifit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id.

her step-father had a large collection of guns at his house. They asked for details about the house and the Defendant supplied them with this information. Co-defendant Alicia Burke testified that the Defendant stated she did not mind if they robbed her step-father, but she did not want to have anything to do with it. The Defendant admitted she stated "just don't kill my mamma" as the group departed from her house. Taken as a whole in the light most favorable to the State, the record supports the jury's conclusion that the Defendant did indeed know[2] that a felony was about to be committed. She was herself involved in the planning of the burglary and was assured enough of its immediate commission that she pleaded with the group as they departed her presence not to hurt her mother, whom she knew was an occupant in the house of the planned burglary.

The Defendant's third claim that the information she provided was not substantial also fails. The Defendant maintains that because the group already knew her step-father had guns and had some idea where the house was, the information she supplied did not rise to the level of "substantial assistance" as required by the facilitation statute. Despite the Defendant's contentions, it is noteworthy that the group did not transition directly from their activities of robbing Hispanics to burglarizing the victim's house. Rather, the group went to the Defendant and asked for specific information about the victim's house relevant for planning a burglary. The Defendant gave them the street address for the victim's home. The Defendant also provided the group with directions on how to get to the victim's house, a description of the house itself, the yard, cars potentially parked there, and other details pertinent to planning a burglary. Accordingly, we find the Defendant's provision of essential information to the burglary to satisfy the requirement of "substantial assistance" as mandated by the facilitation statute.

Given the evidence in the record as interpreted in the light most favorable to the State, the Defendant's participation in the planning activities of a burglary and provision of essential information pertaining to that planned burglary amounted to knowledge of an impending felony and substantial assistance in the commission of that felony. Accordingly, we find the Defendant has failed to demonstrate that the jury was presented insufficient evidence at trial for any rational trier of fact to find beyond a reasonable doubt that the Defendant was guilty of facilitation to commit felony murder. Therefore this issue has no merit.

### III.  SENTENCING UNDER BLAKELY

While not raised on appeal, we are obligated to address the Defendant's sentence in light of the United States Supreme Court's recent ruling in Blakely v. Washington, 542 U.S. __, 124 S.Ct. 2531 (2004), reh'g denied, 2004 WL 1872712 (U.S. Wash. Aug 23, 2004). In Blakely, the high court struck down a provision of the Washington state sentencing guideline--very similar to the one in Tennessee--that permitted the trial judge to impose an "exceptional sentence" after the court made a post-trial determination that certain statutory enhancement factors existed. The Supreme Court

---

[2] Tennessee criminal statutes define the culpability standard of "knowing" as: "refer[ing] to a person who acts knowingly with respect to the conduct or circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b).

-10-

determined that the protections in the Sixth Amendment to the federal Constitution would allow a defendant's sentence to be increased only if the enhancement factors relied upon by the judge were based on facts reflected in the jury verdict or admitted by the defendant. See id., 124 S.Ct. at 2537. The Court concluded that "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." Id., at 2543.

The Blakely decision calls into question the validity of Tennessee's sentencing statutes, insofar as they permit trial courts to increase a defendant's presumptive sentence based upon enhancement factors found by a trial judge as opposed to findings made by a jury. In this case the Defendant was convicted of a Class A Felony with a sentencing range of 15 to 25 years. She was sentenced as a Range I, standard offender with a presumptive sentence of 20 years. See Tenn. Code Ann. § 40-35-210(c) . At the sentencing hearing, the trial court found the Defendant qualified for mitigating consideration since she assisted the police in a homicide investigation. See Tenn. Code Ann. § 40-35-113(9). However, the trial court also found that two enhancement factors should also apply, because the Defendant had a previous criminal history, and had failed to comply with conditions of community release in the past. See Tenn. Code Ann. § 40-35-114(2), (9). The court then declared that "the enhancement factors would outweigh the mitigating factors" and sentenced the Defendant to a term of 21 years.

It is unclear whether these particular enhancement factors, which can be objectively verified by the record, raise a Blakely issue. However, in this case we need not address this point because although neither of these enhancement factors was reflected in the jury's verdict, both factors were indeed admitted by the Defendant at the sentencing hearing. Upon questioning by the State, the Defendant admitted she had a prior conviction for a felony, and that she violated the conditions of her probation in connection with this past felony conviction. Additionally, submitted at the sentencing hearing was a Board of Probation and Parole Investigative Report dated June, 13, 2003, which contained the Defendant's prior criminal record listing six prior convictions and the probation violation. Accordingly, because the Defendant admitted the facts used to determine the applicability of both of the enhancement factors actually applied, we conclude that the trial court's one year enhancement of the Defendant's sentence was not error.

For the foregoing reasons we find the trial court did not err in suppressing the Defendant's statement to the police and that the evidence is sufficient to support the Defendant's conviction beyond a reasonable doubt. Therefore, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE