IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 17, 2005 Session

## STATE OF TENNESSEE v. CRAIG EVERETT SHEARS

**Direct Appeal from the Criminal Court for Knox County**
**Nos. 68041B, 76117     Richard Baumgartner, Judge**

_____

**No. E2004-00797-CCA-R3-CD - Filed September 7, 2005**

_____

Following a jury trial, Defendant, Craig Everett Shears, was convicted of first degree felony murder and especially aggravated robbery. Defendant was sentenced to life imprisonment for the first degree felony murder conviction. Following a sentencing hearing, the trial court sentenced Defendant as a Range I, standard offender, to twenty years for the especially aggravated robbery conviction, and ordered Defendant to serve this sentence concurrently with his life sentence. In this appeal, Defendant argues (1) that the trial court erred in denying Defendant's motion to suppress his statement to police officers and (2) that the evidence was insufficient to support Defendant's convictions. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Richard L. Gaines, Knoxville, Tennessee (on appeal); and Gloria S. Moore, Knoxville, Tennessee, and Bruce E. Poston, Knoxville, Tennessee (at trial), for the appellant, Craig Everett Shears.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; Randall E. Nichols, District Attorney General; G. Scott Green, Assistant District Attorney General; and Phillip Morton, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

The fall semester at Knoxville College ended on December 19, 1998, and the students were required to vacate the dormitories by early evening. Deanna Jones testified that she and her sister, Edie, both students at Knoxville College, checked into the Expo Inn in Knoxville after their dormitory closed. The women intended to spend the night at the motel and then fly to their home in New Jersey the next morning.

Deanna Jones testified that she and her sister arrived at the motel between 7:30 p.m. and 8:00 p.m and were assigned room 207. Sometime during the night, she was awakened by Defendant and Shwan Bough, whom Deanna Jones knew from college. Mr. Bough asked Deanna Jones if he could use the telephone to make airline reservations. Defendant waited by the door while Mr. Bough made the call. The two men stayed about fifteen minutes. As they were leaving, Deanna Jones told Mr. Bough to not forget his pistol which was beneath one of the beds. Mr. Bough picked up the pistol and put it in his sock. The two men returned to Deanna Jones' room two more times. Deanna Jones said that on one of the visits, Mr. Bough called Dante Smith and asked for a ride.

Edie Jones said that she went down to the motel lobby when she woke up on December 20, 1998 and asked the man behind the registration desk for some matches. The man said that he did not have any matches and showed Edie Jones where the coffee maker was located. Edie Jones returned to her motel room with two cups of coffee. Edie Jones said that she heard four gunshots about twenty minutes after she returned to her room.

Dante Smith testified that he received two telephone calls from Mr. Bough on December 20, 1998 asking Mr. Smith to pick him up. On the second call, Mr. Bough gave Mr. Smith directions to the Expo Inn. Mr. Smith said he drove to the motel and parked at the side of the building. He saw Mr. Bough come out of the motel's front entrance first, and then Defendant exited the building about four or five feet behind Mr. Bough. Mr. Bough was carrying a plastic cylinder. Mr. Bough got into the front seat of Mr. Smith's car, and Defendant got into the back seat. While driving in the vehicle, according to Mr. Smith, Mr. Bough said that "he knew he shot him, but he didn't know if he killed him or not." The prosecutor asked Mr. Smith "[w]hat was it that [Mr. Bough] was saying to [Defendant] about the phone lines." Mr. Smith replied, "If he cut the phone lines, that . . . [Mr. Bough] did the rest." Mr. Smith looked at Defendant in the rear view mirror, and Defendant appeared to be scared and confused.

Mr. Smith said that he drove the men to the Knoxville College campus and told them to get out. However, Defendant and Mr. Bough walked to Mr. Smith's apartment, arriving in approximately forty-five minutes. Mr. Smith said that the cylinder Mr. Bough was carrying contained brown envelopes stuffed with money. Defendant and Mr. Bough began counting the cash and coins. Mr. Bough gave Mr. Smith $40.00 and asked him to hide his gun. Mr. Smith refused and asked Mr. Bough if he was "crazy."

On cross-examination, Mr. Smith said that he received the second call from Mr. Bough around 9:00 a.m. He said that Mr. Bough asked him for a ride so they could "hang out." Mr. Smith denied that Mr. Bough told him where to park when he arrived at the motel. Mr. Smith waited about two minutes before Mr. Bough and Defendant came out of the motel. He said that Defendant did not say anything during the drive to the Knoxville College campus. Mr. Smith denied driving Mr. Bough and Defendant to Cumberland Avenue earlier in the morning.

Officer Joe Cox with the Knoxville Police Department said that the telephone lines at the registration counter and in two of the motel's offices had been cut, as well as the trunk line of the

main switchboard. Four .22 caliber long rifle cartridge cases were found at the scene. The victim's blood was found on the drawer under the switchboard and on an invoice on top of the cash register reflecting the rental of room 207 to Edie Jones.

On cross-examination, Officer Cox said that none of the fingerprints lifted at the scene matched Defendant's. He said that the victim called 911 from one of the office telephones which was still in operation.

The stipulated testimony of Dr. Sandra Elkins, the Knox County medical examiner, was offered into evidence. According to Dr. Elkins' autopsy report, the victim was shot three times. The victim was shot once under his right arm and twice in the back. The cause of the victim's death was multiple gunshot wounds and internal bleeding.

Investigator A.J. Loeffler with the Knoxville Police Department arrived at the Expo Inn at approximately 10:15 a.m. on December 20, 1998. When he arrived, medical personnel were loading Mr. Oldham into an ambulance. Mr. Oldham was anxious, but coherent, and Investigator Loeffler interviewed the victim in the ambulance. Mr. Oldham said that two African-American men approached the registration counter in the lobby where Mr. Oldham was working. One of the men pointed a gun at him and demanded his wallet and the money in the motel safe. Mr. Oldham complied with his requests, and then the man shot him. Mr. Oldham said that the two men came from room 207. Mr. Oldham provided detailed descriptions of the two assailants, and his descriptions matched the physical appearances of Mr. Bough and Defendant. Mr. Oldham identified the man matching Mr. Bough's description as the shooter.

Investigator Loeffler said that all of the motel's offices, which included rooms 104, 105 and 106, were accessible from the lobby. The telephone lines in rooms 105 and 106 had been cut, and the filing cabinet drawers were open. There were drops of blood beneath the telephone in room 104. The trunk line of the motel's main switchboard had been cut, as well as the line to the telephone in the office area behind the registration counter. Investigator Loeffler said that a key was needed to open the cash register without inputting a room number, and that type of transaction was reflected as a "no sale." A "no sale" transaction was made at 10:03 a.m.

Investigator Loeffler took Edie and Deanna Jones to McGhee-Tyson Airport and the Knoxville bus station to assist in identifying Mr. Bough and Defendant if the two men were attempting to leave the Knoxville area. The bus line's reservation summary showed that Defendant had purchase a ticket for Chicago for December 20, 1998. Investigator Loeffler waited until the bus left, but Defendant did not show up.

Investigator Loeffler and Investigator Dwight Loop interviewed Defendant in Homewood, Illinois on March 24, 1999. Defendant's statement was tape recorded, and the tape was played to the jury. Defendant initially said that he got drunk alone after the dormitories closed at Knoxville College on December 19, 1998. He said he then went to the Expo Inn and fell asleep in the room used by Edie and Deanna Jones. When he woke up the next day, a man he knew only as "Shawn"

was in the room. Defendant said he thought Shawn's last name started with "B." Defendant said that he and Shawn left the motel around 9:00 a.m. with a friend of Shawn's. Shawn and his friend dropped Defendant off at Ridgebrook Apartments where he spent the morning gambling. The two men returned about an hour later and joined Defendant. Defendant and Shawn flew to Chicago out of Nashville later that day and stayed with Defendant's father over the break. Defendant said that he heard about the shooting at the Expo Inn some time later. Defendant denied that he took a cab from Cumberland Avenue to Mechanicsville on December 19, 1998. Defendant stated that he was unarmed, but that Shawn had a gun while they were at the motel. Defendant said that Shawn did not go the registration counter while they were leaving the Expo Inn.

Investigator Loeffler said that Defendant asked to use the bathroom at this point in the interview. When the interview resumed, Defendant said that Mr. Bough told him that he was going to rob the registration clerk on their way out of the motel that morning. Mr. Bough told Defendant to stand by the front door and "watch his back." Defendant said that Mr. Bough did not pull out his gun until Defendant was by the front door. Mr. Bough approached the man behind the registration counter and demanded money. The man placed several envelopes containing money on the counter, and Mr. Bough put the money in his pocket. Defendant said that Mr. Bough began firing his gun, and Defendant ran out of the motel after the second shot. Defendant said that he did not see Mr. Bough cut the telephone lines in the motel's offices.

Mr. Smith was waiting in his vehicle for Defendant and Mr. Bough. Defendant said that Mr. Smith did not know about the robbery. Mr. Smith asked the two men what they had done, and Mr. Bough replied, "I just laid him down." Defendant said he was in the back seat "just f___ wigging out." Mr. Smith stopped the car and told Defendant and Mr. Bough to get out.

Defendant and Mr. Bough walked to Mr. Smith's apartment where they stayed about five minutes. Defendant then ran into a friend who agreed to take Defendant to Nashville to catch an airplane to Chicago. Mr. Bough offered Defendant's friend some money to take him with them to Nashville. Defendant said that he and Mr. Bough caught an evening flight, but he said that he had not seen Mr. Bough since their arrival in Chicago.

On cross-examination, Investigator Loeffler said that both Deanna Jones and Mr. Smith in their initial interviews told him that Mr. Bough directed Mr. Smith to park by the side of the motel when he arrived. Investigator Loeffler said that Mr. Smith was never a suspect in the crime, however, because nothing in Defendant's initial statement to the police indicated that Mr. Smith knew about the robbery. Investigator Loeffler said that he never told Mr. Smith that there was a possibility that he could be charged with the offense.

Investigator Loeffler said that another robbery had occurred earlier in the morning of December 20, 1998. A cab driver was robbed after transporting three African-American men to an area in Mechanicsville around 6:00 a.m. Investigator Loeffler said that the cab driver identified Aaron Walker, or "Ace ,"as the gunman. Investigator Loeffler said that a telephone call was made from the Expo Inn to Mr. Smith at 5:34 a.m.

On redirect, Investigator Loeffler said that the cab driver let his three assailants out on Cansler Street, approximately one-half mile from the Expo Inn. The gunman took the cab driver's fares and cell phone, and ripped out his CB radio so that he could not call for help. The cab driver's cell phone was used to place several calls as follows: at 9:22 a.m., a call to a San Franciso number; at 9:29, a local call; at 9:29, a call to a voice mail number; at 9:32, a call to Mr. Smith's telephone number; and at 9:35, a call to Chicago. Investigator Loeffler said that Mr. Bough was eventually located in San Francisco.

The defense then offered its proof. Defendant testified that he met Mr. Smith and Mr. Bough at Knoxville College. Mr. Bough at some point stopped attending classes, however, and began to sell marijuana. Defendant said that he went to a gathering at the dormitory director's house after the dormitories closed on December 19, 1998. The director drove him, Mr. Bough, Ace Walker, and Mr. Walker's girlfriend, Cynthia, to the Expo Inn later that evening where Mr. Walker had reserved a room. Defendant made a reservation to fly to Chicago out of the Nashville airport because the airline was offering a discounted fare for this flight. The group smoked marijuana and drank alcohol until midnight when Defendant and Mr. Bough went to room 207 which had been rented by Edie and Deanna Jones.

Defendant said that Mr. Bough called Mr. Smith from room 207 about dawn and told Mr. Smith to pick him, Defendant and Mr. Walker up at the motel. Mr. Smith drove the men to a parking lot near Fort Sanders Hospital and dropped them off. Defendant asked Mr. Walker what they were going to do, and Mr. Walker said, "don't worry about it." The men walked to Cumberland Avenue where Mr. Walker flagged down a cab. Defendant and Mr. Bough got into the cab's back seat, and Mr. Walker sat in the front. Mr. Walker told the cab driver to pull over when they reached the Mechanicsville area. Defendant handed the cab driver a couple of dollars, and he and Mr. Bough got out. Mr. Walker then pulled out a gun and robbed the cab driver. Then three men ran away.

Defendant fell asleep in a chair in Mr. Walker's room when they returned to the Expo Inn. Mr. Bough woke him up later and said, "let's go." The men walked into the lobby, and Mr. Bough told Defendant he was going to rob the registration clerk. Defendant said that he told Mr. Bough that he did not "want no parts [sic] of that." Mr. Bough told him to "just stand right there." Mr. Bough was carrying the gun used by Mr. Walker during the earlier robbery.

Defendant said that Mr. Bough approached the victim who was standing behind the registration counter. The two men conversed for a couple of minutes, and then Mr. Bough pulled out his gun. The victim jumped back and put his arms up. Mr. Bough went behind the counter and out of Defendant's line of vision. Defendant saw Mr. Bough return to the counter with some money which he put in a bag. Then Mr. Bough shot the victim. The victim turned and began to run. Mr. Bough fired three more times. Mr. Bough ran past Defendant in the front lobby and told him to "come on." They ran out of a side door, and Defendant saw Mr. Smith waiting for them with his car's engine running. Defendant got into the back seat, and Mr. Bough sat up front with Mr. Smith. Mr. Bough said , "I think I might have killed him." Mr. Smith became upset and angry and told Defendant and Mr. Bough to get out of the car.

Defendant and Mr. Bough walked to Mr. Smith's apartment. Mr. Bough cleaned his gun with alcohol and gave Mr. Smith a stack of twenty-dollar bills from the stolen money. Defendant said that he saw a friend who agreed to give him a ride to Nashville in a couple of hours. The friend warned Defendant to stay away from Mr. Bough. When the friend returned to pick up Defendant, Mr. Bough offered him some money to take him to Nashville, and the friend agreed. Defendant said that he did not call the police after the robbery and lied to the police during the interview in Illinois because he was scared.

On cross-examination, Defendant said that he did not know that the cell phone Mr. Bough used later in the morning belonged to the cab driver. Defendant said he called his girlfriend in Chicago with the cell phone. Defendant said that he did not see Mr. Bough carrying a knife and did not see him cut the telephone lines in the motel's offices.

Mr. Smith was recalled to the stand. He admitted that Mr. Bough called him around 5:30 a.m. on December 20, 1998, but he denied that he picked anyone up from the Expo Inn at that time. Mr. Smith said that Mr. Bough called him around 9:00 a.m. and that it took him approximately forty-five minutes to get to the Expo Inn. He denied again that Mr. Bough directed him to park in the parking lot at the side of the motel, but acknowledged that he told the police differently when he was first interviewed about the crime. Mr. Smith said that he drove past the lobby's glass windows when he parked the car, but he said that he did not see either Mr. Bough or Defendant.

The State called Russell V. Orr, Jr. as a rebuttal witness. Mr. Orr said that he was a cab driver, and he picked up three African-American men between 5:30 a.m. and 6:00 a.m. The men told him to drive around the Fort Sanders' area while they looked for a car. They did not see the car, and the man in the front seat told him to drive to Cansler Street. Mr. Orr stopped and told the men that the cab fare was eight dollars. The men in the back seat handed him some money and got out of the cab. The man in the front seat pulled out a gun and told him to "give me all your money." The other two men were standing by the cab's back door and could see the robbery. The robber also took Mr. Orr's cell phone and pulled out his microphone. As the men walked away from the cab, Mr. Orr heard one of the men say, "shoot him, shoot him," but the men did not return to the cab.

## II. Motion to Suppress

Defendant argues that his statement to the police on March 24, 1999 was involuntarily made and the result of coercion on the part of the interrogating officers. As a result, Defendant argues that the trial court erred in denying his motion to suppress his statement.

At the suppression hearing, Investigator Loop said that they learned that there was an outstanding warrant for Defendant's arrest for a traffic violation in Homewood, Illinois. Officers from the Homewood Police Department arrested Defendant on the warrant and brought him to the police station where Investigators Loop and Loeffler were waiting. After obtaining some background information, Defendant was read his *Miranda* rights, and he stated that he understood

them.  Investigator Loop said that he stressed to Defendant that he could stop the interview at any time, and Defendant executed a written waiver of his *Miranda* rights.  Investigator Loop denied that the investigators made any promises in exchange for Defendant's statement.

Investigator Loop said that Defendant initially denied any participation in the robbery.  At that point, the following exchange occurred:

| [LOEFFLER]: | Now listen to me.  You can either be a witness to this, or you can be a suspect in this.  We think you're a witness, okay?  I don't think this was your idea.  I don't think you're the one that planned this and said, hey, let's go do this, okay.  I don't think you're the one that went in there with the intention of doing this . . . |
| --- | --- |
| [LOOP]: | Look, [Defendant], now this is . . . this is what you've got to think about.  That man down there at that motel was robbed and shot . . . that motel owner.  He's a respectable business person in the City of Knoxville.  Now, you have some information that can help us with that case, and it's not going to go away, okay.  It's not going to go away.  You can either help us with this, tell us what you know about it and help yourself, or you can . . . you can take the consequences with Shawn B.  Now you just think about what a jury in Knoxville, Tennessee will do to some people from L.A. or Chicago who just killed a respectable business man and robbed a motel down there.  Now you'd better think about that, okay.  Now you can tell us the truth . . . we know the majority of the details, okay, or we wouldn't be up here.  We're not up here just to be sightseeing.  We're up here to get the truth from you.  And the reason we're coming here to talk to you is that we don't think . . . we don't believe you were the shooter.  But you . . . you know what happened . . . you got caught up in something that uh . . . you probably didn't plan, you probably didn't know anything about until it happened . . . until its going to happen.  But now's the time to get your butt out of the fire. |
| [DEFENDANT]: | Um huh. |
| [LOOP]: | You understand what I'm saying. |
| [DEFENDANT]: | Yeah, I understand, but . . . |

[LOOP]: Naw, let's don't, you know . . . you know what happened in there and now's the time to save yourself. This is not going to go away. We are not going to pack up and leave here and forget the whole thing . . . uh . . . now, we've came [sic] up here and we've been nice to you, we've gave [sic] you an opportunity to tell your story, and this is going to be the only opportunity that you get to tell your story. The next time, you will be sitting in a courtroom in front of a jury. Now you can help us and help yourself, or you can hang tough and you can be sitting in a penitentiary in a cell over from Shawn B on death row. Now you want to tell us what happened.

[DEFENDANT]: Can I use the bathroom?

[LOOP]: Do what?

[DEFENDANT]: Can I go to the (laugh) bathroom?

[LOOP]: We'll let you go to the bathroom, but before we let you go to the bathroom, you want to tell us the truth about what happened?

[DEFENDANT]: Let me go to the bathroom . . . then I'll tell you about . . . man, I mean I don't know. Just let me go to the bathroom. Let me make a phone call and then go to the bathroom . . .

[LOEFFLER]: Cause after this, we're going to go back to Knoxville if you don't want to talk to us, and we're going to get a Grand Jury together, and we're going to subpoena you to come down there. And you can tell them the same things and say I don't want to talk and that's fine . . . but that's not . . . that's going to be [twelve] people sitting on that panel looking at you and you're going to be sitting there . . . this is my story, when between you and me . . . I know that half of its [b___s___], plain and simple. Okay. You know that as well as I do.

[LOOP]: [Defendant], I would like to go back to Knoxville and tell our D.A. that you've cooperated with us, that you did the right thing, and tried to make this wrong right . . . and tried to correct everything that's happened and help us with this and . . . and get some closure on this thing. I'd like to be able to go back and tell them that. But if I go back and say you was [sic] hanging tough up here, and you know what's going to

> happen after that . . . you're going to go with Shawn B. Now, that's simple . . . you tell us what happened.

[DEFENDANT]:     Um huh.

[LOOP]:     You understand?

[DEFENDANT]:     I mean, I understand . . .

Investigator Loop said that at this point Defendant reached over and turned off the tape recorder, and Defendant was escorted to the bathroom. When he returned, Defendant was again provided his *Miranda* rights, and Defendant said he understood his rights. Defendant then admitted he had been present when Mr. Bough went into the registration office at the Expo Inn. Investigator Loop said that Defendant told them he had spoken to his aunt, who was an attorney, when he first returned to Chicago. Defendant described a hypothetical situation, and his aunt told him that the person involved in the situation should tell the truth.

Investigator Loeffler testified that he escorted Defendant to the bathroom and allowed him to stretch his legs and get a drink. Investigator Loeffler said that Defendant did not ask to use the telephone during the break. On redirect examination, Investigator Loeffler identified a printout of Defendant's prior criminal history showing that Defendant was convicted of simple possession of marijuana in 1995, and again in 1996, and convicted of a theft offense in 1996.

Defendant did not testify at the suppression hearing. The trial court accredited the investigating officers' testimony that Defendant understood his *Miranda* rights, that Defendant requested and was given a break from the interview, and that he was *Mirandized* a second time after the break and before he made his incriminating statements. Relying on our Supreme Court's decision in *State v. Smith*, 933 S.W.2d 450 (Tenn. 1996), the trial court denied Defendant's motion to suppress his statement, stating:

> Its my judgment, in this case, that merely saying to [Defendant] that we'd like to be able to go back and tell the District Attorney that you've come clean with us and told us the truth does not overcome [Defendant's] voluntary will to resist making these statements. He knew that he had the right not to talk to these people. He knew he had the right to terminate the interview if he chose to do so. He knew he had the right to consult counsel if he chose to do so, and he chose not to do so, and I don't believe that their telling him that he ought to come clean and tell them the truth about what happened and that they'd like to be able to tell the D.A. that he did cooperate–they didn't promise him that as a result of that he would get any specific benefit from that, but they told him that they'd like to be able to go back and do that. I don't think that's impermissible conduct on behalf of the police department, and I don't believe that changes this from a voluntary to an involuntary statement.

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon this court unless the evidence contained in the record preponderates against them. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, this Court is not bound by the trial court's conclusions of law. *State v. Simpson*, 968 S.W.2d 776, 779 (Tenn. 1998). The application of the law to the facts found by the trial court are questions of law that this court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). The defendant has the burden of establishing that the evidence contained in the record preponderates against the findings of fact made by the trial court. *Braziel v. State*, 529 S.W.2d 501, 506 (Tenn. Crim. App. 1975).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U. S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Our Supreme Court has previously concluded that "the test of voluntariness for confessions under Article 1, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

The officers' testimony that Defendant was read and understood his *Miranda* rights was not factually disputed by Defendant. Relying on *State v. Phillips*, 30 S.W.3d 372 (Tenn. Crim. App. 2000), Defendant argues, however, that the investigators' coercive tactics and promises of leniency served to overbear his will and render his statements involuntary. Specifically, Defendant contends that the investigators told Defendant that he could either be a witness or a suspect when there was no question that Defendant was a suspect, that the investigators told Defendant that they already knew many of the details of the robbery when it was clear that they did not, and that the investigators told Defendant that if he continued to "hang tough, Defendant would end up on death row with his co-defendant."

"[I]n order for a confession to be admissible, it must be 'free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however, slight, nor by the exertion of any improper influence . . .'" *Smith*, 933 S.W.2d at 455 (quoting *Bram v. United States*, 168 U.S. 532, 542-43, 18 S. Ct. 183, 187, 42 L. Ed. 2d 568 (1897)). In Tennessee,

> promises of leniency by state officers do not render subsequent confessions involuntary *per se*: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency.'" *Smith*, 933 S.W.2d at 455 (quoting [*State v.*] *Kelly*, 603 S.W.2d [726, 729 (Tenn. 1980)](quoting *Hunter v. Swenson*, 372 F. Supp. 287, 300-01 (D.C. Mo. 1974)(emphasis added)). The critical question is "'whether the behavior of the state's law enforcement

-10-

officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self determined. . . .'" *Id*. at 728 (quoting *Rogers* [*v. Richmond*, 365 U.S. 534, 544, 81 S. Ct. 735, 741, 5 L. Ed. 2d 760 (1961)).

In *Smith*, the defendant, who was accused of aggravated sexual battery, admitted to his counselor at the Luton Mental Health Center that he had engaged in unlawful sexual contact with his stepdaughter. *Smith*, 933 S.W.2d at 453. The defendant argued that he made his incriminating statements in response to the counselor's assurance that he would be extended leniency if he did not exercise his right to avoid self-incrimination, and that he would be prosecuted if he did exercise that right. *Id*. at 455. In finding that the defendant's statements were not "compelled by impermissible threats or promises of leniency so as to render them involuntary," the Supreme Court noted that "[a]dvice to an individual concerning the consequences of a refusal to cooperate is not objectionable," and stated that "'[t]ruthful statements about [a defendant's] predicament are not the type of 'coercion' that threatens to render a statement involuntary.'" *Id.* at 456. *Id.* at 456 (quoting *United States v. Pelton*, 835 F. 2d 1067, 1073 (4th Cir. 1987). Based on the circumstances presented in the case, the Supreme Court concluded that the defendant's statements "were not 'compelled' in violation of the Fifth Amendment or Article I, § 9." *Id.*

In *Phillips*, however, this Court found that the line of questioning employed by the investigators, unlike the questions presented in *Smith*, impermissibly "crossed the line." *Phillips*, 30 S.W.3d at 377. The defendant in *Phillips* was facing allegations of sexual misconduct, and investigators from the Department of Children's Services interviewed him in connection with the allegations. Although he denied the allegations at first, the defendant became increasingly equivocal as the interview progressed, and he finally conceded that he had engaged in sexual misconduct with one of his stepdaughters. The transcript of the interview indicated that one of the investigators told the defendant that they had DNA evidence linking the defendant to the alleged crimes when, in fact, no DNA sample had been taken; that the investigators requested the defendant to confess on numerous occasions in order to avoid prosecution; and that the investigators "insisted that a full confession was necessary in order for him and his stepdaughter to secure treatment." *Id.*, at 375. Based on the facts presented in this case, this Court founds that the evidence revealed "(1) misrepresentations by an investigator; (2) numerous steadfast denials by the defendant; (3) statements that law enforcement officials would be involved if defendant did not confess; and (4) promises of treatment for the defendant and his stepdaughter only if he fully confessed. *Id.* at 377. Based on the circumstances presented, this Court concluded that there was sufficient coercion and promises of leniency to overbear the defendant's will to resist. *Id.*

In both *Smith* and *Phillips*, unlike the instant case, the defendants' statements were made in a non-custodial situation which did not require the provision of *Miranda* warnings. *See Smith*, 933 S.W.2d at 454; *Phillips*, 30 S.W.3d at 376. In the case *sub judice*, Defendant was read his *Miranda* rights, and Defendant signed the written waiver of those rights. Investigator Loop testified that Defendant, who was a college student at the time of the offenses, understood his *Miranda* rights.

At the time of the interview, the investigators had detailed physical descriptions from the victim which matched Defendant's and Mr. Bough's physical appearances. The victim told the police officers that the two assailants came from Room 207 before they approached the registration desk. Edie and Deanna Jones said Defendant and Mr. Bough had been in their room on the morning of the robbery. The victim identified the man matching Mr. Bough's description as the shooter. We cannot conclude that Investigator Loop's comment that he knew "the majority of the details" of the offenses misrepresented the extent of his knowledge at that point.

What was unknown to the investigators at the time of Defendant's interview was the nature of the role Defendant played in the commission of the offenses. Based on a careful reading of the record, we conclude that the investigators' statements concerning the fact that Defendant might be a suspect, the potential for a grand jury investigation, and the possibility that Defendant would be prosecuted along with the co-defendant does not render Defendant's subsequent statement involuntary. *See Smith*, 933 S.W.2d at 456.

Prior to making his statement, Defendant asked for and was given a break from the interview. Investigator Loeffler said that Defendant went to the bathroom, got a drink, and "stretched his legs." Defendant was read his *Miranda* rights again when the interview resumed. Although he initially said that he wanted to use the telephone, Defendant did not repeat this request during the break. The interview lasted approximately one and one-half hours.

Based on the totality of the circumstances surrounding Defendant's statement, we conclude that his statement were not "compelled" in violation of the Fifth Amendment of the United States Constitution or Article I, § 9 of the Tennessee Constitution.

Defendant also argued in his brief that the trial court erred in denying his motion to suppress because the investigating officers did not stop the interview after Defendant requested an attorney. At the hearing on Defendant's motion for new trial, the trial court permitted defense counsel to make an offer of proof on the record concerning Defendant's allegation that his request for an attorney during the interview was not honored. Defendant testified that after the tape recorder was turned off, Defendant told the investigators that he wanted to call an attorney, and they told him that "all deals are off" if he did. Defendant said that the investigators told him he would only be a witness, not a suspect, if Defendant told them what he knew. Following this conversation, Defendant said that the tape recorder was turned back on, and Defendant made his incriminating statements under the belief that he would not be charged with the crimes.

The trial court denied Defendant's motion for new trial, stating that it would not consider evidence beyond which was not presented at the suppression hearing. "[I]n evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may [only] consider the proof adduced both at the suppression hearing and at trial." *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998). Defendant is not entitled to relief on this issue.

## III. Sufficiency of the Evidence

Defendant does not contend that Mr. Bough did not rob and kill Mr. Oldham. Defendant argues, however, that the evidence is insufficient to support his convictions of especially aggravated robbery and first degree felony murder under a theory of criminal responsibility because the proof did not establish that he intended to commit robbery, the underlying felony. Defendant argues that at no time did he intend to commit a crime, that he ran away from the motel office as soon as he heard gunshots, and that he did not have any contact with Mr. Bough after the two men flew to Chicago on the day of the offenses.

When a defendant challenges the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.; State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

Felony murder, as pertinent here, is the killing of another in the perpetration of a robbery. Tenn. Code Ann. § 39-13-303(a)(2). Especially aggravated robbery is a robbery committed with a deadly weapon during which the victim suffers serious bodily injury. *Id*. § 39-13-403(a). "A defendant is criminally responsible as a party to an offense and may be charged with commission of the offense where the offense is committed by another person for whom the defendant is criminally responsible." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000) (citing Tenn. Code Ann. § 39-11-401). "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." *Id*. § 39-11-402(2).

"Presence or companionship with the perpetrator of the felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." *State v. Jones*, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999). It is not necessary for the criminally responsible defendant to take a physical part in the crime.

Viewing the evidence in a light most favorable to the State, the proof showed that Defendant and Mr. Bough accompanied Mr. Walker in the early morning hours of December 20, 1998 when Mr. Walker robbed Mr. Orr.  The three men returned to the Expo Inn together.  Later that morning, Mr. Bough woke Defendant up and said "let's go."  Defendant and Mr. Bough walked down one flight of stairs to the motel lobby.  Mr. Bough told Defendant he was going to rob the registration clerk and asked Defendant to "watch his back."  After Mr. Bough shot Mr. Oldham, the two men exited the Expo Inn and left the premises in Mr. Smith's car.  Mr. Smith said that both men counted the money taken in the robbery while they were at his apartment.  Later that afternoon, the two men traveled to the Nashville airport and flew together to Chicago.

Based on a thorough review of the record, we conclude that a rational trier of fact could have found beyond a reasonable doubt that a robbery and killing was committed by Mr. Bough, that Defendant was a party to the commission of the crimes, and that Defendant was criminally responsible for Mr. Bough's conduct.  Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review of the record, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE

-14-